## QUEEN INS. CO. OF AMERICA v. GLOBE & RUTGERS FIRE INS. CO.

(District Court, S. D. New York. March 11, 1922.)

**1. Collision ⬉40—Vessels in meeting convoys held both at fault.**

Where two convoys of vessels sailing without lights met nearly head on, each of two colliding vessels *held* at fault, the east-bound vessel for failing to turn back to the designated course after porting to pass a vessel in the first tier of the meeting convoy, and in stopping across the path of a vessel in the second tier, and the west-bound vessel for not immediately slackening speed when the other convoy was sighted.

**2. Collision ⬉108—Faults in navigation in meeting convoys held not errors in extremis.**

Faults in navigation by vessels in two convoys, which met nearly head on at night while sailing without lights, *held* not excusable as faults in extremis, notwithstanding the confusion which would naturally be caused by the situation.

**3. Collision ⬉35—Prime cause of collision between vessels in meeting convoys held failure of naval authorities to prevent meeting.**

The original cause of a collision between two convoys of vessels, which met nearly head on at night while sailing without lights, was the failure of the naval authorities, either those in charge of the convoys or those on the shore, to prescribe courses for the convoys which would have prevented their meeting.

**4. Insurance ⬉406—Character of cargo immaterial in determining whether loss was war risk.**

In view of the known purpose of Germany to destroy ships, regardless of the nature of the cargo, the character of the cargo carried by a vessel under convoy, whether munitions, contraband or noncontraband, is immaterial in determining whether the loss of the vessel was due to a war risk.

**5. Insurance ⬉413—Liability for collision on marine war risk policy is question of proximate cause.**

In deciding whether the insurer of a vessel against war risks was liable for loss of the vessel, the determining issue is the proximate cause of the loss in the legal sense of that phrase.

⬉For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**6. Insurance ⊂⟩412—Word "consequences," in marine policy, refers to totality of causes.**

Where a marine insurance policy speaks of the "consequences" of an enumerated list of happenings, the word "consequences" refers to the totality of causes and not to their sequence.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Consequence.]

**7. Insurance ⊂⟩406—"Acts in prosecution of hostilities" is not equivalent to "all consequences of hostilities or warlike operations."**

Where a war risk policy insured against "acts in prosecution of hostilities between belligerent nations," it did not fully supplement a policy insuring against other perils "free from all consequences of hostilities or warlike operations."

**8. Insurance ⊂⟩146(1)—Marine insurance clause should be construed to secure uniformity in the commercial world.**

The interpretation of a marine insurance policy is not a question of morals or of public policy, and the important thing is to secure uniformity of an interpretation in a commercial world embracing more than one continent and more than one ocean.

**9. Insurance ⊂⟩406—Sailing in convoy under naval directions is not "warlike operation."**

The fact that a merchant vessel sailed in convoy under compulsion of the war situation and subject to naval direction, and thereby increased the danger of collision, which is one of the perils of the sea, was not in itself a "warlike operation," so as to render the insurer against war risks liable for loss of the vessel due to a collision which resulted when two such convoys met nearly head on at night.

In Admiralty. Libel by the Queen Insurance Company of America against the Globe & Rutgers Fire Insurance Company. On final hearing. Libel dismissed.

Bigham, Englar & Jones, of New York City (Oscar R. Houston, of New York City, of counsel), for libelant.

Burlingham, Veeder, Masten & Fearey, of New York City (Charles C. Burlingham, Van Vechten Veeder and Ralph W. Brown, all of New York City, of counsel), for respondent.

HOUGH, Circuit Judge. The Italian steamship Napoli sailed from New York for Genoa in June, 1918. At Gibraltar she became one of a convoy of cargo boats proceeding from Gibraltar to Genoa. On this trip Napoli collided with the British steamship Lamington, which was one of another convoy of similar vessels then proceeding from Genoa to Gibraltar. About an hour after collision, and as a result thereof, Napoli sank; both ship and cargo became a total loss.

Part of Napoli's cargo was covered by what is commonly known as a "marine policy," issued by libelant, Queen Company, and the same cargo was further covered by what is called a "war risk" policy issued by respondent, Globe Company. Loss being admitted, but each underwriter asserting that the other should pay, each by agreement and without prejudice paid the insured half the amount due by some one, whereupon libelant (having succeeded in the familiar manner to the rights of cargo owner) brought this suit against the "war risk" underwriter, seeking to recover as of right the amount not already advanced by respondent.

⊂⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Thus this question is presented, viz.: Under the circumstances in evidence, was the collision between Napoli and Lamington (which admittedly produced the loss of the insured cargo) due to a "marine risk" or "war risk"?

The libel asserts both convoys were "directed by competent naval authorities"; the west-bound convoy was ordered to make certain designated courses; all vessels were required to travel in specified formation, without lights, and to obey the orders of the convoying warships in the event of known proximity of German submarines; finally the duly constituted naval authorities so laid out the courses of the convoys that "they would meet in the course of their navigation." It is then alleged in substance that, as the result of these convoy regulations, the collision occurred, in that, shortly before midnight of July 4–5, the convoys met "approximately head on," producing a situation of such danger, difficulty, and confusion that, although both Lamington and Napoli "acted with all due care," collision occurred. This is in effect an averment that collision was proximately caused by the method of convoying.

It is also alleged that in the east-bound convoy "some or all of the vessels [therein] carried munitions and/or contraband, and all of them were liable to condemnation or destruction under the German law." This is an endeavor by the pleader to assert that Napoli's going in convoy was (in the language of the policy in suit) "an act of kings, etc., authorized by and in prosecution of hostilities."

Before considering the words of contract, the facts must be stated, so far as the meager record permits their ascertainment. The parties have united in seeking information about the collision; but the naval authorities of Great Britain and Italy refused assistance, wherefore the evidence consists of logs and statements from such of the escorting vessels as were of the United States navy, affidavits or depositions from officers and men of Napoli, given in legal or administrative proceedings, and opinions rendered therein in Italy and England, together with excerpts from the manifest of the Napoli.

Unsatisfactory as this is, there is, I think, enough to enable the court to treat the legal questions, without feeling that, were the facts really known, there might appear some error or fault in ship management that would dispose of the case, before reaching the problem of interpreting policy clauses in question.

Without resting decision even partly on the truth that libelant must bear the burden of proof, I find, on all the evidence, nothing to show that Napoli or any other merchantman was compelled to go in convoy. For all that appears, she was free to sail alone. But it is an inference easily made, from what is proven, that she would have run far greater danger by avoiding convoy than by joining one. She sought the protection of a convoy, and so did all other well-advised vessels of no greater speed than Napoli possessed (12 knots).

If a vessel took convoy, she was obliged to conform to instructions as to courses and management given by "competent naval authorities," and such instructions came from three sources: (1) General orders at Genoa or Gibraltar, as the case might be, emanating from shore or

port authority, or perhaps the admiral on the station, (2) the senior naval officer in escort, who enforced the general orders and exercised his own judgment in departing from them in detail, if necessary, and who might or might not be (3) the commodore of the convoy, who carried his flag on a merchantman, and sought to keep the other cargo boats in rank, at proper speed, etc. If, however, this commodore ranked the commanders of all the escorting vessels, he was also the senior naval officer present, and functioned as such.

Of the two convoys in question, the west-bound was in charge of a rear admiral of the Italian navy, on a merchantman, the Italian steamship Ansaldo III, who was both senior officer present and convoy commodore; the escort consisting of small vessels from British, Italian, and American navies. The east-bound convoy had for commodore a commander in Italian navy on board the Napoli, the senior naval officer was a captain in the British navy, and the escorting vessels were of the same diverse nationalities as were those of the other convoy.

It is not, however, true that either convoy or both were obliged by orders given on or before departure to pursue fixed courses for the entire contemplated trip. The west-bound vessels were merely ordered after leaving a buoy outside Genoa harbor to take "courses according to the signal of the commodore" on Ansaldo III; while the east-bound fleet was given definite courses until such time as they should reach 42° 58′ N. and 7° 50′ E., from which position, called "Genoa rendezvous," they were to proceed "according to instructions from Genoa," which, so far as appears, were never given. This point is about 70 miles from Genoa, and the place of collision was, according to the repeated statements of Napoli's master, 43° N., 7° 58′ E. In other words, the Napoli had proceeded beyond the limit of courses antecedently laid down, and was presumably taking whatever direction was ordered by Captain Ryan, R. N., as senior naval officer present. This is even more true if the Lamington's calculation of position be accepted—43° 8′ N., 7° 46′ E. It is therefore not true that the convoys met, by reason of pursuing courses predetermined for them at the places of departure.

By no formal written order were the vessels of either convoy spaced apart or given distances; nor is any written order produced directing them to navigate without lights. It is, however, inferable from the evidence, and is matter of common knowledge, that they were expected and required (warships and merchant vessels alike) to keep their lights screened, but ready for instant exhibition. The arrangement of vessels in convoy formation, while not formally prescribed in writing, was a matter evidently so well known as to be left to the senior naval officer; the convoy was arranged according to a system obviously accepted and understood by all officers interested.

It is not easy to ascertain with exactness what were the distances between the vessels in each tier or rank, or the distances between the several tiers. Each convoy consisted of three tiers, but not of the same number of vessels in each tier. The Lamington's or west-bound convoy had eight vessels in the front tier, either five or six in the second, and three in the third. The Napoli's or east-bound convoy had

apparently seven vessels in the first tier and a smaller number in the second and third. Some of the east-bound vessels had left that convoy before collision, bound for Marseilles.

Libelant's Exhibit 2 (document 10) is an endeavor to depict the position of Napoli, Lamington, and certain other vessels at and shortly before collision occurred. That exhibit seems to be inaccurate, in that it shows Napoli as in a front rank or tier of six only; she was the middle ship of seven. The vessel immediately behind her was the Swedish steamship Otto Sverdrup.

Document 10, again, cannot be reconciled with the order issued by the Italian admiral in charge at Genoa for the arrangement of vessels in the west-bound convoy. If that order was complied with, the flagship Ansaldo III was the fourth vessel in the first tier of eight (counting from port to starboard), and the vessel immediately behind her in the second tier was the Plymouth, and not the Lamington, as shown in document 10. In fact, there is no Lamington named in the list of west-bound vessels; but the Harington, which is taken to be the Lamington, was in the second tier, and behind the third front tier vessel. That the vessel called the Harington was the Lamington is conclusively shown by an entry in log of Yankton, the American naval vessel with west-bound fleet. On the morning of July 5 Yankton signaled to vessel U. B.: "Were you injured last night, and are you able to proceed?" U. B., according to Genoa orders above referred to, was the Harington; and U. B.'s answer was, "Consider it inadvisable to proceed, due to damages sustained last night in collision with unknown steamer." If Lamington had been directly behind Ansaldo III, she would have been vessel V. B., which was not injured, and was American steamship Plymouth, to which the Italian admiral transferred his flag.

I think it fairly shown that vessels in the same tier were expected to remain (from beam to beam) not over 500 yards apart, probably somewhat less, while the distance between tiers (or fore and aft) was about 600 yards, except when the convoy was "zigzagging," in which case the distance was lengthened to about 800; but these distances are approximate only, and the figures given are for the east-bound vessels. Distances for those west-bound were slightly shorter.

The log of Castine, the American naval vessel escorting the east-bound convoy on the port flank, shows that that convoy had great difficulty in maintaining distances fore and aft, and the Otto Sverdrup was an especially persistent straggler. But as midnight of July 4th approached the log shows that the convoy was in no worse plight than "poor formation." It can be said with certainty, however, that as the two convoys approached each other the east-bound fleet presented a front from the port to the starboard escort (escorts endeavored to maintain position of 400 yards off the flanks) of something less than two nautical miles, and the west-bound convoy something over that distance.

By all the evidence the weather was "hazy," yet the testimony is unanimous that the loom of vessels in the west-bound fleet was seen by Napoli's observers at a distance of 1,000 meters, and the commanders of Castine and Yankton think the range of visibility three-quarters of a mile or a little less, and from the Castine's deck (some 400 yards

off the port flank of the east-bound convoy) it is agreed that her observers could see three vessels, in the front tier of her convoy. It is plain that the whole range of visibility, at and before the time of collision, was for a moonless night unusually high.

The fleets met by computation (document 10) at an angle between their courses of about 30 degrees; yet the testimony from Napoli (evidently adopted by the pleader for libelant) is uniform that the west-bound vessels, when seen, seemed almost end on, and I think that navigation was on that theory of direction. There was no fixed or inflexible rate of speed for either convoy. The west-bound ships were out of Genoa harbor about 10:50 a. m. July 4th, and about an hour later the commodore and senior naval officer on Ansaldo III signaled to Yankton, "Can you tell me the exact speed of the convoy as we have no log?" to which the Yankton replied, "Speed about 7.3 knots." This or a slightly greater speed was evidently maintained, because any material variations therefrom would have been noted in the log in evidence. The east-bound fleet was proceeding at about the same rate; on this point there is ample evidence. It follows that the vessels were approaching at between 14 and 15 knots an hour.

At approximately 7 p. m. of July 4th a vessel in the west-bound convoy was injured by a submarine at a point about N. 50° E. (true) of the place of collision, and rather less than 30 knots distant therefrom. Thereupon the west-bound escort vessels set out in search of the attacking submarine, and for that reason the navigation records in evidence are more meager in respect of the west-bound than of the east-bound fleet. It is plain that the west-bound convoy immediately began to zigzag; it is not plain whether, when the convoys sighted each other, the original course had been made good; but I take the opinion (it is no more) of Lieut. Burns, of the Yankton, who was "reasonably sure that [his] convoy was off the course laid down before the attack" at the time of sighting the other fleet. But it is quite impossible to say whether it was off course to the south or north.

The fleets sighted each other almost exactly in the middle of the passage between northeastern Corsica and France, a stretch of water between 95 and 100 miles wide. As soon as the loom of the other ships appeared, both fleets turned on their navigating lights, so that I find the precollision situation was this: Upwards of 35 vessels with their accompanying escorts, divided into two approximately equal fleets, were approaching each other nearly end on, at the rate of over 14 knots an hour, when the distance between the leading tiers of each fleet was not over three-quarters of a nautical mile.

Of this situation at least the first tiers of both convoys were instantly aware. Each thought the other vessels were approaching almost end on. In point of fact they were not so approaching; but their navigation must be judged by what the navigators believed at the time. It is to me plain beyond argument that under the apparent circumstances the duty of every navigator was to slow down to steerage way and stick as nearly to his course as possible, in the hope that the vessels of each fleet would pass through the lanes between the fore and aft lines of the other fleet.

Most of the steamers must have done this, for otherwise it is inconceivable that no more than six vessels out of so many got into collision. In respect of the collisions that did occur, that between the Albatross (west-bound) and Hjelfjord (east-bound) was very reasonably attributed by the Italian investigating commission to the fact that the Albatross never turned on her lights. That between Ansaldo III and the Sverdrup was found by the same commission to have been contributed to, if not caused, by the failure of Ansaldo III "to stop by reversing the engines and giving the three regulation whistles to warn the ships in the vicinity." Thus presumably competent investigating authority has attributed fault in navigation to certain of the other vessels colliding at the same time as did Napoli and Lamington.

[1] The convoys approached each other, so that if courses and speeds were maintained there would have been a collision between Napoli and Ansaldo III. This was avoided by the vessels passing each other port to port, though how near does not appear. This is the natural result of what, by his statements before the commission in Genoa and before the English court, the captain of Napoli did, to wit, port his helm. But he did not, by his own statement, endeavor to straighten up and keep on down the lane, which he must have known to exist. On the contrary, he either kept going to port, or indulged in what he admitted "might be called the serpentine," and stopped. In my opinion he stopped directly in the path of the Lamington, which vessel I am convinced (differing from document 10) was traveling (if in reasonably good formation) from 500 to 800 yards on the port quarter of Ansaldo III. In no other way can the collision be accounted for with so broad an angle between the colliding vessels as is admitted all round. Meanwhile Lamington had continued to proceed at least 6 knots until she saw the Napoli, or the latter's lights, so near at hand that collision was inevitable.

It is my opinion, and I find from the material furnished, that both the vessels here involved navigated faultily. The Napoli, in that, having ported to such an extent that she ought to have known she was getting in the way of the next fore and aft convoy line, stopped and (as it seems to me) invited collision with any vessel in that line that came up out of the night; while the Lamington was at fault for maintaining so great a speed that she could not possibly take off her way before colliding with whatever she could clearly make out ahead. It may be noted that the speed of the Lamington is not only admitted, but would necessarily be found from consideration of the violent blow she struck the much larger and more powerful Napoli.

I have felt obliged to make these criticisms on the navigation of the two vessels, although not unmindful of the Italian and English findings. The commission felt—

"it their duty to point out the circumstances under which the maneuvers in question had to be executed, and are of opinion that the anxiety of the commanders must have been very great because, besides having to avoid the steamers ahead, they had also to seek to avoid being struck by those astern. Moreover the sudden appearing of so many lights, the noise of so many sound signals directing the maneuvers, must necessarily have generated a confusion which was entirely to the disadvantage of the necessary calm

which every commander had to preserve in order to avoid collisions which appeared impending from all sides."

This is undoubtedly true, but after all amounts to no more than saying that navigation at the time and place was attended with great difficulties. The English trial (of a suit by owners of cargo on Napoli against owners of Lamington) resulted in a judgment by Hill, J., finding no fault in Lamington (with which I do not agree), but declaring concerning the whole situation that—

"It seems to me to be quite clear that this is one of those cases in which two convoys, unlighted, suddenly became aware of one another's presence at a very close distance, became greatly confused in their formation and in the efforts they made to avoid one another, without any fault on the part of anybody the collision took place."

[2] The force of this is thoroughly recognized, but I strongly incline to the opinion notwithstanding, that such excusatory remarks as this amount to a refusal to find fault whenever the circumstances are sufficiently alarming to furnish some excuse for losing one's head. Result is that I consider this collision as having resulted, not only immediately, but, in the legal sense, proximately from poor navigation on the part of both colliding vessels.

Yet, though entertaining the foregoing opinion, I recognize the force of an argument contra, which may be thus stated: Allowing for Napoli's slowing and stopping and for Lamington's ultimate reversal full speed astern, there could not have been more than 2,000 yards between Napoli and Lamington when the navigating lights were flashed on, and the time between that moment and collision could not have been more than five minutes, and quite probably less. It may be argued that in such a situation, assuredly one of terror and confusion, faults of navigation such as I think occurred may be regarded as in extremis, and the cardinal, and in a legal sense proximate, cause of collision be found in whatever train of circumstances or whatever human direction, or lack of it, produced such a situation of danger, confusion, and terror.

[3] In my opinion the causa causans of all the collisions of that night was the total disregard by each convoy of the other. Instead of courses and distances having been laid down (as alleged in the libel) which were certain to produce a meeting of convoys, I am persuaded that neither convoy paid any attention to the approach or proximity of the other, and there was no central or controlling authority which guided, could guide, or was expected to guide the movements of both convoys in relation to each other.

It is not believed that the torpedoing of a vessel in the west-bound convoy five hours before meeting the east-bound fleet affected this matter at all, or, if it did, it was pure ill luck. For all that the naval or navigating authorities did or expected to do (so far as this record shows) it was chance, and no more, whether the senior naval officers of the respective fleets did or did not steer courses that would intersect with those of the other convoy. And with each officer navigating (so far as shown) absolutely for himself, it was quite natural that each would steer for the middle of the passageway between Corsica and France, and that is exactly where they met. The one fairly certain re-

sult of torpedoing Merida (vessel T. B. west-bound) was to slow up
the convoy, so far as getting toward Gibraltar was concerned. It is
rather less than 30 nautical miles from the scene of Merida's mischance
to that of collision, and it required five hours to make that distance.
If the speed was anything over 6 miles (and estimates vary from 7.3
to 8.5), there was a great deal of "zigzagging" done; but all without
any reference to the other convoy.

It follows that, in my opinion, a certain and important navigator's
fault lay with the senior naval officers of both convoys in failing to
take any steps to prevent just such a meeting as did occur. But this
latter fault (assuming it now to exist) raises a question which is one
of law, viz. whether such careless navigation on the part of the con-
voyers produced a risk for which protection must be sought under the
policy of the libelant rather than that of respondent.

[4] It remains to consider the facts with regard to the cargo of the
Napoli. It is agreed that the major portion of her large cargo could
fairly be described as general; but in Mr. Hann's affidavit libelants ex-
hibit a list of cargo articles which they declare to have been "intended
for use by the Italian government in prosecution of war." The list is
considerable in itself, but insignificant as compared with the lading of
a vessel of Napoli's size. It is my opinion that this list contains cer-
tainly one and perhaps two articles which may be called munitions of
war, to wit, certain tubes for "Italian 80-foot sub-chasers," and "artil-
lery case heading press." The rest of the list is beyond question con-
traband, and more than conditional contraband, too; but that is all.
But the goods are in my opinion no more closely allied to warlike opera-
tions, or to the waging of war, than was the asbestos which constituted
the portion of the cargo insured by both parties to this litigation.

In the light of what is now history, it seems to me rather absurd to
ground argument concerning the presence or absence of war risk sole-
ly upon the nature of even an entire cargo, not to speak of the nature
of scattered and numerically insignificant articles thereof; this because
the war risk was the same, no matter what the character of cargo. It
is history that in the summer of 1918 the sea power of Germany out-
side the North Sea was represented solely by submarines, whose ob-
ject was to destroy commerce, and that meant to destroy ships; the
nature of cargo was a matter of no consequence. Thus I think consid-
eration of the law is reached.

[5, 6] Some points are admitted all round: (1) That declaring
liability upon such a policy as that in suit is (after ascertaining the se-
quence of happenings) a quest for proximate cause in the legal sense
of that phrase; and (2) that, where a policy speaks of the "conse-
quences" of an enumerated list of happenings, the word refers to the
totality of causes, and not to their sequence. For the first proposition
sufficient authority in this court is to be found in The Canadia (Muller
v. Globe, 246 Fed. 759, 159 C. C. A. 61; and the second has not been
doubted since the Ionides Case, 14 C. B. (N. S.) 274 (290).

It is now necessary to consider the exact phrasing of the policy in
suit, for, whatever may be accepted general principles, there can be no
liability except under one particular policy. The history of the f. c.

and s. clause and the rise and development of the war risk clause are, however interesting, only important as casting light on the habits of mind or methods of reasoning pursued by courts whose authority is generally recognized and who spoke before the great development of war risk which has marked the period since 1914. This history and the standard or commonly used forms of marine and war risk clauses may be found sufficiently stated in Gow, Mar. Ins. pp. 114, 115, 360, and Gow, Sea Ins. pp. 84, 85. It is observable that the forms of words used by the American underwriters both for marine and sea perils in this case are quite different from the forms which in the opinion of the learned author referred to had become common in English and continental marine circles prior to 1914.

It may also be noted that the clause sued on in The Canadia, supra, was quite peculiar, and I now note as my opinion that that decision is of no value in this litigation, except on the point of proximate cause, because decision was based on the finding of fact that the "Canadia and her cargo were seized, arrested, and detained within the meaning of the policy" there at bar. No such contention is here made. Having thus laid aside The Canadia, supra, it is admitted that this is a pioneer action in the courts of this country upon a war risk policy, but that there is in Great Britain a long line of cases arising upon the forms of war risk there lately used. These British forms were so well known that the exact wording does not always appear in the reported cases; but they were obviously so uniform that it may reasonably be assumed that all in substance resemble the phrases of The Matiana and The Petersham, [1921] A. C. 99. There the f. c. and s. clause warranted free "from all consequences of hostilities and/or warlike operations whether before or after declaration of war," and the war risk clause covered "all consequences of hostilities and warlike operations by or against the king's enemies before or after declaration of war."

The f. c. and s. clause in libelant's marine policy is as follows:

"Warranted by the assured free from loss or expense arising from capture, seizure, restraint, detention or destruction and the consequences thereof, or of any attempt thereat, and also from all consequences of riots, insurrection, hostilities or warlike operations, whether before or after declaration of war, and whether lawful or unlawful, and whether by the act of any belligerent nations, or by governments of seceding or revolting states, or by unauthorized or lawless persons therein, or otherwise."

And the assumption clause in respondent's war risk policy is as follows:

"It is agreed that this insurance covers only the risk of capture, seizure, or destruction, or damage, by men-of-war, by letters of marque, by takings at sea, arrests, restraints, detainments, and acts of kings, princes, and people authorized by and in prosecution of hostilities between belligerent nations."

[7] The war risk clause ought logically to be the supplement of the f. c. and s. clause in the marine policy. This logical result is reached in the English cases, so far as they reveal the exact language of the several policies. In the present instance it seems to me entirely plain that, whereas, the marine underwriter excluded in terms "all consequences of hostilities or warlike operations," the war risk underwriter did not assume "all consequences." His undertaking is not the supple-

ment of the marine policy, but (for the purposes of present litigation) he only assumed liability for "acts of kings authorized by and in prosecution of hostilities." This is very far from being the equivalent of "all consequences of hostilities or warlike operations."

But I shall not dwell upon this difference; it is preferred to treat the case as one of principle, and therefore I shall speak as though the respondent had insured (as the defendants in the reported British cases did) against "all consequences of hostilities or warlike operations." The question may be reduced to its lowest terms as follows: Admittedly the loss flowed directly from the collision between Napoli and Lamington. Therefore the question is this: Was that collision a consequence of hostilities or warlike operations?

On the reason of the matter I have already stated my view of the argument based upon the nature of the Napoli's cargo. But further, upon authority, it is the nature of the operation, not the character of the cargo, which is the material thing determining the query whether the vessel is engaged in an act of hostilities or in a warlike operation. The Larchgrove, 36 Times L. R. 108. I have not overlooked Hindustan, etc., Co. v. Admiralty, 37 Times L. R. 856, Peninsular v. Commonwealth, 9 Lloyd's List, 208, and Atlantic, etc., Co. v. Director, 38 Times L. R. 160. Whether these first instance cases are all reconcilable with each other, or with ruling authority, is not a matter of importance; it suffices to note that none of them is in terms applicable to the facts at bar.

The main contention of libelant may be, I think, thus formulated: There was in substance compulsion upon the Napoli and other vessels to sail in convoy and not otherwise. It makes no difference whether the compulsion arose from the folly and danger of going alone or from positive governmental direction; it was compulsion just the same. She and the other vessels did sail in convoy, and were therefore entirely under the direction and guidance of naval authorities. In convoy the vessels did sail without lights; and, to sum the matter up, they were from start to disastrous finish conducted, controlled, ordered, and in effect navigated (in the larger sense) by the representatives of their own or another sovereign power.

To this major premise may be added the following subordinate proposition: Napoli and Lamington did display ordinary care and skill on the part of their respective navigators, but (if this be not absolutely true) such errors of navigation as were committed were faults in extremis, and therefore the collision was proximately caused either (1) by the necessity of going in convoy under admitted conditions, or (2) by the personal fault of the senior naval officers of both convoys and/or by the shore authorities at each end of the Genoa-Gibraltar line in taking no steps to prevent the meeting of convoys sailing in opposite directions exactly as these two convoys did meet.

[8] It would be a professional pleasure to feel at liberty to treat both these questions from what I regard as the standpoint of reason; but I do not think that pleasure can be accorded. The question is not one of morals, nor of public policy; it is no more than the interpretation of certain forms of words, which are not sacred, which have varied,

and may be changed at any time to suit the apparent necessities of commercial profit. The important thing is to secure uniformity of view in a commercial world, which now embraces and long has included more than one continent and more than one ocean. I shall therefore briefly state my own view, and decide this case on what I conceive to be authority.

The baldest statement of libelant's position is to say that the act of sailing in convoy without lights is in and of itself a warlike operation; and from this flows the conclusion that such marine disasters as may reasonably be expected to result from convoy dangers are themselves the result of warlike operations. My own view on this matter is that of Bailhache, J., expressed in The Petersham, Britain, etc., Co. v. The King. [1919] 1 K. B. 575 (580), and The Matiana, British, etc., Co. v. Green, [1919] 1 K. B. 632 (636), viz.:

"However peaceful the immediate business upon which a ship is engaged, if she is sailing as one of a convoy she is engaged, in my opinion, in a warlike operation. The assembling, presence, protection, and movements of the king's ships protecting the convoy are a warlike operation, and both convoyed and convoying ships are taking part in it, and that character attaches to the whole flotilla and covers the whole operation."

And the learned judge continues:

"Suppose a dangerous route from which lights had been removed was prescribed (by the authorities) to deceive the enemy; and a ship taking such a route, without negligence, runs ashore and is lost as the direct result of the removal of the lights; would such a loss be covered by the words 'warlike operation'? I think it would, but not because the ship was carrying out a warlike operation. The warlike operation would be the removal of the lights."

This I think to be the large and common sense view of the situation. Quite possibly there was a time when war was no more than the ultima ratio regum; and while kings wrangled traffic might continue subject to the right of search and most oppressive Stowell-made rules as to contraband; but still it was essentially peace-time traffic, peacefully conducted in the main. But, when war became what it was between 1914–1918, it is now history that commerce existed only as an adjunct to war, and for the purpose of creating and maintaining armed forces to insure the economic defeat of the enemy.

The Napoli was taking a cargo from America to Italy, and even courts may take cognizance of the fact that in June, 1918, no such cargo was a possibility that did not in the opinion of governmental representatives from at least three governments (British, Italian, and American) directly assist in the task of defeating Germany. In a large sense the very act of sailing was a consequence of hostilities. In short, almost every act of the warring countries, after the home-staying population was fed, clothed, and sheltered, was but a manifestation of war. For these reasons I agree in principle with Bailhache, J., and particularly sympathize with the defiance flung by him at the reasoning of The Ionides Case, supra, indicated in the last of the above quotations.

But the spirit of The Ionides decision triumphed when the Matiana and Petersham Cases had gone through the Court of Appeals ([1919] 1 K. B. 670) and received final treatment in the House of Lords ([1921] 1

A. C. 99). The majority opinions start with the proposition that collisions, strandings, and the like are normally marine perils; they are normally covered by the ordinary marine policy; the turn of mind evidenced by insistence upon this commonplace is manifest. It is the same habit of thought that dominates all the early cases, and especially the Ionides decision, to wit, that that precaution of war, or, indeed, that warlike operation, which no more than heightens the old well-known pre-existent perils of sea navigation, does not change in kind such peril.

The cases above referred to and the citations therein may furnish many illustrations of this kind of reasoning, which has been accepted to the full by the English courts. My personal opinion is that the doctrine now established by authority is best expressed by Atkin, L. J., in the Court of Appeals, and Lord Wrenbury in the House of Lords in The Petersham and Matiana decisions.

[9] It is thus, I think, settled by authority that sailing with a general cargo, however contraband (for, municipally speaking, there is nothing unlawful about contraband) cannot be a warlike operation; the mere joining of a convoy, though compulsory, is not a warlike operation; the management or mismanagement of a convoy is likewise not a warlike operation; and, indeed, operations only become warlike when they are designedly offensive (McGregor v. Martin, 34 Times L. R. 504), or where the injury causing loss is proximately due to an enemy effort. Thus, in the present case, if the submarine that sank the Merida 30 miles from collision had chased the west-bound convoy, while exercising ordinary navigational skill, into a collision or stranding, the case would have fallen under war risk. But where war and its necessities had no more to do with the resultant collision, stranding, or foundering than to multiply pre-existing dangers, and known dangers at that, the foundation is not laid for discharging the marine underwriter and resting upon the war risk policy.

The case of The Matiana is a far more aggravated instance of directed dangerous navigation than is the present one. Here, in my judgment, there was a singular and inexcusable lack of care in indicating any lanes of traffic to the opposing streams of convoy travel between Genoa and Gibralter, and these convoys were moving almost like ferries. But in The Matiana there were orders to run through dangerous waters, amid treacherous currents, and without the advantage of a lighthouse. Yet the Matiana war risk underwriters were discharged. Result is that:

First. It is my personal opinion on this record that, acknowledging the danger in which these two convoys found themselves at midnight of July 4, 1918, the navigators of both Napoli and Lamington failed in their ship management to exercise the ordinary care and skill of their calling. Therefore such negligence was the proximate cause of collision, and the loss must fall upon the marine underwriters.

Second. But, passing this first holding, and admitting that whatever faults were committed by the colliding vessels were errors in extremis, it must be held under authority, to which for business purposes the courts of the United States should conform, that the collision in

question was not proximately caused by any act of hostility or by the consequences thereof; because

Third. The act of joining a convoy, the act of sailing therein without lights, and the act of steering courses directed by naval authority are not, whether separately or conjointly considered, to be regarded as a warlike operation.

For these reasons the libel is dismissed, without costs.