CRIST v. UNITED STATES WAR SHIP-
PING ADMINISTRATION.

No. 9145.

Circuit Court of Appeals, Third Circuit.

Argued Jan. 23, 1947.

Decided June 26, 1947.

Arnold W. Knauth, of Washington, D. C. (John F. Sonnett, Asst. Atty. Gen., Gerald A. Gleeson, U. S. Atty., of Philadelphia, Pa., and Russel L. Hiller, Asst. U. S. Atty., of Reading, Pa., on the brief), for appellant.

Abraham E. Freedman, of Philadelphia, Pa. (Freedman, Landy & Lorry, of Philadelphia, Pa., on the brief), for appellee.

Before BIGGS and KALODNER, Circuit Judges, and McGRANERY, District Judge.

KALODNER, Circuit Judge.

Appellee brought an action in admiralty to recover war risk insurance for the death of her son, Theodore W. Ellse, a member of the crew of the S.S. "Maiden Creek," a vessel documented under the laws of the United States.

The deceased seaman was employed by the Waterman Steamship Corporation. The latter purchased from the War Shipping Administration Insurance Division[1] a policy insuring the crew of the "Maiden Creek" against loss of life, bodily injury, etc., "directly occasioned by capture, seizure, destruction by men of war, piracy, takings at sea, arrests, restraints and detainments and other warlike operations, * * * and acts of kings, princes and peoples in prosecution of hostilities. * * *"

The question for determination is: was the loss of Ellse's life due to a risk of war or warlike operations and thus within the scope of the policy sued upon, or was it the consequence of a marine peril which would bar recovery?

Preliminarily it must be kept in mind that an appeal in admiralty partakes of a trial de novo and serves to vacate the decree of the district court; that the findings of the latter when supported by competent evidence are entitled to great weight and that such findings should, therefore, not be set aside on appeal except upon a showing that they are clearly wrong. The S.C.L. No. 9, 3 Cir., 114 F.2d 964, 966. The basis of the latter rule is "that the trial judge has a peculiar opportunity for appraising the worth of oral testimony by observing the witness' demeanor which the cold print of a record fails to disclose." The S.C.L. No. 9, supra. The rule is modified where the findings of the district court are based wholly on depositions. Matson Nav. Co. v. Pope & Talbot, Inc., 9 Cir., 149 F.2d 295.

In the instant case, the District Court's findings were premised solely on depositions submitted and not on the testimony of the single witness who appeared before it. The witness who appeared merely testified as to the radio log of the "Maiden Creek."

At this point it must be stated that the appellee bases the right to recovery on two theories. The first theory is that the "Maiden Creek" was "ordered" into a convoy and was thus under "restraint" when the loss occurred; the second theory is that the S.S. "Exhibitor" which responded to an SOS call of the "Maiden Creek" "abandoned" her because of a fear of submarines and that the latter action came within the category of "other warlike operations" as stated in the policy.

It may be noted parenthetically that originally, in the libel filed, the second theory

---

[1] The War Shipping Administration was and is a governmental agency of the United States established by Executive Order on February 7, 1942; the functions and duties of the War Shipping Administration are, inter alia, to provide marine insurance and re-insurance against loss or damage by the risks of war or warlike operations as authorized by Section 222 of the Merchant Marine Act of 1936 as amended on April 11, 1942, Section 1128a, 46 U.S.C.A.

Section 222 provides in part as follows: " * * * The (Maritime) Commission may insure against loss or damage by the risks of war, persons * * * as follows: * * * (e) Masters, officers, and crews of such vessels and other persons employed or transported thereon against loss of life, personal injury, or detention by an enemy of the United States following capture. * * *"

alone was relied on by the appellee as sustaining the right to recovery.

The District Court, however, did not premise allowance of recovery on the score latterly mentioned but rested its finding in favor of the appellee on the ground that the proximate cause of the loss was "the 'restraint' imposed by the military authorities" upon the "Maiden Creek" in ordering her into a convoy and exercising "complete control over" her as will be subsequently discussed.

The appellant contends that there is no liability; that none of the events which occurred was a risk of war or a warlike operation, within the terms of the war risk policy. It asserts that the loss was solely the consequence of a marine peril.

As to the facts:

The "Maiden Creek," carrying a cargo of gasoline, left New York in a convoy on October 11, 1942. It ultimately arrived in Greenland (date undisclosed) and discharged its cargo, after which it proceeded to Botwood, Newfoundland, where it took on a cargo of ore concentrates and then proceeded to St. Johns, Newfoundland, arriving there December 10, 1942. It left St. Johns two days or so later in a convoy bound for New York.

Severe storms were encountered and the "Maiden Creek" shortly lost its convoy. The vessel labored in the heavy seas for several days and when its fuel supply began to run low changed its course from its intended destination and headed for Halifax, Nova Scotia. It arrived at Halifax "in distressed condition and down by the head." The "Maiden Creek" remained in Halifax for four or five days where it took on oil and the water was pumped out. At some time during its stay in Halifax the Master and Henry S. Connolly, the radio operator of the "Maiden Creek," separately attended convoy conferences with Canadian Naval authorities. Connolly in his deposition stated that he did not know what took place at the conference attended by the Master. He subsequently saw "written orders with reference to sailing in the Master's quarters" but was not shown the instructions that pertained to sailing, but only the instructions that pertained to the operation of the signal equipment.

The "Maiden Creek" left Halifax in convoy on December 27, 1942, bound for New York. It was at that time "down by the head." The third day out of Halifax the convoy ran into a gale and the "Maiden Creek" had difficulty maintaining her speed and position and became unable to keep up with the convoy. Since the vessel was "falling behind all the time" and was "going down by the head," the Master decided to leave the convoy. Thereafter, the Captain decided on his own volition to change course so he would have the benefit of running with the seas in the attempt to run up the coast of Long Island and in the hope of being able to get into Long Island Sound.

At the time the vessel changed course— about 11 o'clock A.M. December 31, 1942— it was five to eight miles astern of the convoy. Immediately following the change of course the speed of the "Maiden Creek" came up to 10 knots an hour; the seas were heavy, the weather "real bad." About 2 o'clock the Master gave instructions to the radio operator to prepare a coded message to the Coast Guard Station on Long Island describing the vessel's difficulties, giving its course, speed, position, and asking for help. The message was sent at 3 o'clock.

A plain language SOS was sent out shortly before 5 o'clock and the S.S. "Exhibitor" arrived at the scene almost immediately. It came virtually alongside the "Maiden Creek" and advised her by blinker signal that she was prepared to take off her crew. At the time, some members of the crew of the "Maiden Creek," equipped with life preservers, were standing by the lifeboats; other crew members were on the bridge. The lifeboats "were all in their chocks" where they were usually carried, but they were not readied for use.

The "Exhibitor" inquired of the "Maiden Creek" by blinker signal if she wanted to abandon ship and received conflicting replies. The "Exhibitor" then pumped oil overboard to smooth the seas so as to facilitate abandoning operations.

However, the "Maiden Creek" kept going at the rate of four or five knots an hour and the "Exhibitor" "couldn't figure out what they were trying to do." The "Exhibitor" then signalled the "Maiden Creek" if they were going to abandon they would have

to abandon before dark." Subsequently the "Maiden Creek" sent out a message cancelling its SOS. That was about 5:24. About a half hour later the "Exhibitor," after circling around twice, and seeing no evidence of any attempt or intention on the part of the distressed ship to abandon, left the scene. It did not signal the distressed ship that it was going to do so. At the time the "Exhibitor" left the "Maiden Creek" the latter was proceeding toward Block Island about 100 miles away at about four or five knots an hour. As the "Exhibitor" was steaming away she received a message from the "Maiden Creek" asking her to leave an oil slick to Block Island. She did not do so.

After the "Exhibitor" sailed away—she was then about three or four miles off and the sun was about on the horizon—the Master of the "Maiden Creek" gave orders to abandon. The seacocks were smashed to let the water in so that the vessel would sink and would not be a hazard to navigation. About five minutes later two lifeboats were lowered, 25 men in one and 31 in the other. The boat with Ellse was lost, the other lifeboat was subsequently rescued. The vessel itself sank a number of hours later.

Connolly, the radio operator of the "Maiden Creek," supplied the details as to what occurred after the "Exhibitor" sailed away. He stated that before the crew took to the lifeboats he called the Master's attention to the fact that the "Exhibitor" was leaving but that the Master "said no," that she was "just circling around." Connolly suggested that he go back to the radio room and send a new SOS but that the Master refused to give him permission to do so.

Connolly made the further statement that after the SOS was cancelled and prior to the departure of the "Exhibitor", the Master of the "Maiden Creek" had stated that he "was going to let some of the crew members leave the ship and that he wanted to keep as many of the men as were willing to stay and attempt to run the ship into the Coast," and that he asked him to stay. He said that prior to the cancellation of the SOS an "abandon ship" order had been given by the Master, but that it was subse-

quently rescinded and the crew went back to quarters.

The above rather detailed recital as to the occurrences on December 31, 1942 is necessitated by the fact that the appellee, as stated at the outset, urges that the departure of the "Exhibitor" under all the circumstances came within the "other warlike operations" provision of the war risk policy so as to create a liability for the loss.

In support of her contention, the appellee asserts that "were it not for the war, the 'Exhibitor' would have remained as long as necessary after dark to receive the survivors" and that "this fact alone identifies the situation as a risk of war or warlike operations clearly within the coverage of the policy."

The testimony, however, clearly establishes that the "Exhibitor" left the "Maiden Creek" primarily because of the conviction of its Master and officers that the distressed vessel did not intend to abandon and was intent on continuing its voyage.

The Master of the "Exhibitor," Elbert C. Wilson, in his deposition, testified that he sailed away from the "Maiden Creek" because he had come to the conclusion that she was not going to abandon. He gave as his reasons for that conclusion the fact that the "Maiden Creek" had maintained her speed at all times and the usual practice was not to do so in an abandoning action; the "Maiden Creek" cancelled her SOS; it was getting dark and the crew of the "Maiden Creek" had made no apparent attempt to abandon ship; the "Maiden Creek" asked for an oil slick to Block Island; before leaving he received no communication from the "Maiden Creek" after she cancelled her SOS; and "we were never advised she was being abandoned." Wilson also testified that he "refused to stay around after dark" because of submarines and that he had so advised the "Maiden Creek" when he first arrived.

Paul P. Pelton, Third Mate of the "Exhibitor," testified in his deposition "if they had made any move whatever to abandon the ship, I am sure we would have stayed there until all the people that could have been rescued had been." He stated that the fact that the "Maiden Creek" continued

moving led the officers of the "Exhibitor" to conclude that the "Maiden Creek" did not intend to abandon. Pelton also testified as to the "Exhibitor's" concern as to submarines.

John E. Gilleland, the second mate of the "Exhibitor," testified similarly in his deposition. He was the officer on watch at the time his ship came to the aid of the "Maiden Creek." He operated the blinker signal in communication with the distressed vessel. He said there were two answering signals on the "Maiden Creek," one on the boat deck and the other on the bridge. In response to his signalled question whether the "Maiden Creek" intended to abandon ship, the signal on the boat deck replied "Yes, we will" but the Captain's signal on the bridge said "No, we are not abandoning." Immediately after a message was received cancelling the SOS, creating a quandary aboard the "Exhibitor." Gilleland stated "we stood around for another 35 minutes waiting to see what was going on, but the vessel kept on her course in a sort of northerly direction at about four or five knots. Since we had the annulment, the Captain ultimately decided to keep on to New York." Gilleland also told of the fear of those aboard the "Exhibitor" of submarines, but his testimony clearly indicated that the reason for his ship's departure was the conviction that the "Maiden Creek" did not intend to abandon.

The testimony of Connolly, the radio operator of the "Maiden Creek" as to what transpired on his vessel from the time of the arrival of the "Exhibitor" until its departure, discloses that those aboard the "Exhibitor" were fully justified in concluding that the "Maiden Creek" did not intend to abandon and intended to attempt to make port.

First, Connolly's deposition reveals that prior to the arrival of the "Exhibitor" the Master of the "Maiden Creek" rescinded an "abandon ship" order, sending the crew back to quarters; that the Master ordered the SOS cancelled some time after the arrival of the rescue vessel; that it wasn't until after the "Exhibitor" had sailed away and was three or four miles off that the Master issued orders again to abandon ship.

In the face of the testimony cited, the District Court made a specific finding that "the Master of the 'Exhibitor' abandoned the 'Maiden Creek' because he was in great fear of lurking submarines * * *," etc. (Finding of Fact No. 24). We are of the opinion that the Court's finding in this respect is without basis in the testimony.

It is appropriate here to note that despite its finding, the District Court specifically stated in its opinion "* * * we are not inclined to pass judgment on this phase of the matter" in referring to the appellee's contention that the departure of the "Exhibitor" constituted a "warlike operation."

While in view of our fact finding with respect to the "Exhibitor"-"Maiden Creek" episode no further discussion is necessary, we cannot avoid the comment that even assuming the facts to be as urged by the appellee we cannot see how liability would attach under the terms of the war risk policy in question. Not a single authority was cited by the appellee in support of her contention.

Coming now to the ruling of the District Court that there was such a "restraint" on the lost vessel by the military (Naval) authorities as to establish liability under the terms of the war risk policy:

The Court below based its findings in favor of the libellant on the ground that certain "enumerated compulsions and controls constitute a 'restraint' as provided for in the supplement to Decision No. 1 of the Maritime War Emergency Board". The "enumerated compulsions and controls" were specifically described by the Court in the following language:

"The record is replete with testimony tending to show that the military authorities *exercised complete control* over the convoy which included the 'Maiden Creek'. The latter *could only leave port under the direction and supervision of the Naval escort.* The Master was *required* to attend convoy conferences for instructions concerning the navigation and control of the vessel. The Master *could exercise no discretion, he had to leave in a convoy* pursuant to a definite plan which required the vessel to hold a certain place in the convoy and maintain a course as directed

by the Naval escort. A Navy crew was aboard the 'Maiden Creek' as well as every other American vessel which put out to sea during war time. The 'Maiden Creek' *was forced to put to sea* in an unseaworthy condition and ordered to maintain a specified speed and course in the convoy." (emphasis supplied)

■ An examination of the record fails to disclose any basis for the Court's findings "* * * The Master could exercise no discretion, he had to leave in a convoy * * * The 'Maiden Creek' was forced to put to sea in an unseaworthy condition * * * The military authorities exercised complete control over the convoy which included the 'Maiden Creek'. The latter could only leave port under the direction and supervision of the Naval escort."

The only testimony on the subject of the presence of the "Maiden Creek" in the convoy was given in the deposition of the radio operator, Connolly, and the record is devoid of testimony which would even inferentially support the District Court's findings.

Connolly merely testified that prior to the vessel's departure from Halifax for New York he attended a convoy conference for radio operators while the Captain attended one for Masters. Connolly explicitly stated that he didn't know what took place at the Masters' conference. He said that at a later time he was called to the Captain's quarters and was given instructions as to the operation of his signal equipment—that the written instructions "were part of the instructions for the particular convoy." That was the sum total of the testimony as to what occurred at Halifax with reference to the convoy.

In view of the testimony itself, or perhaps it would be better to say the absence of testimony, the conclusion is inescapable that the District Court arrived at a series of inferences premised upon the mere sailing of the "Maiden Creek" in convoy. That is apparent from the Court's finding that the "Master was required to attend convoy conferences for instructions concerning the navigation and control of the vessel"; that "the vessel was required to hold a certain place in the convoy and maintain a course as directed by the Naval escort"; that the vessel was "ordered to maintain a specified speed and course in the convoy"; and that "a Navy crew was aboard the 'Maiden Creek.'"

■ Assuming that there was a practical necessity on the part of the "Maiden Creek" to join a convoy, in the absence of any evidence that the vessel was *ordered* to join a convoy by any governmental agency or military or naval authorities, the practical necessity would not of itself constitute a restraint.

In Queen Insurance Co. of America v. Globe & Rutgers Fire Insurance Co., 263 U.S. 487, 44 S.Ct. 175, 68 L.Ed. 402, usually known as the Napoli case, the "Napoli" sailed from New York for Genoa with a cargo, part of which was intended for the Italian Government. At Gilbraltar she joined a convoy. The convoy sailed with screened lights protected by British, Italian and American war vessels and navigated by an Italian Commander on the "Napoli," subject to the command of a British Captain as the senior naval officer present. At midnight, another convoy similarly commanded, met this one head on. The "Napoli" was struck by a vessel in the second convoy and was sunk.

The "Napoli" was covered by a marine policy. The latter contained the following F C & S clause (free of capture and seizure): "* * * warranted by the assured free from loss or expense arising from capture, seizure, *restraint,* detention or destruction and the consequences thereof * * * and also from all consequences of * * * warlike operations * * *." (Emphasis supplied) The Supreme Court ruled that the loss of the "Napoli" was not due to a war risk under the terms of the policy mentioned. Mr. Justice Holmes, who delivered the opinion of the Court, noted therein that it was "practically necessary" for the "Napoli" to join the convoy at Gibraltar although she was not ordered to do so by the military powers.

Thus the situation in the instant case anent the "Maiden Creek's" participation in a convoy is on all fours with that in the Napoli case. In both cases it was

"practically necessary" for the vessels to join a convoy. There was no evidence of "orders" by the military to join the convoy in either case. It should be noted that the policy in the Napoli case also insured against "restraints."

In the original disposition of the case, D.C., 278 F. 770, at page 783, the District Court stated:

"The act of joining a convoy, the act of sailing therein without lights, and the act of steering courses directed by Naval authority are not, whether separately or conjointly considered, to be regarded as a warlike operation."

A similar conclusion was reached in the case of The Larchgrove v. The Crown [1919] 1 Ll. L. Rep. 498 K.B., 36 T.L.R., 108. The English Merchant ship "Larchgrove," sailing under requisition charter to the British War Ministry in World War I, was sailing in a convoy without lights as ordered and came into collision with the American freight ship "Hawaiian," manned by Navy ratings, also navigating without lights. The "Larchgrove" was sunk, and the question was whether the Crown should pay for her under the requisition charter by whose terms the Crown assumed the war risks. The court of King's Bench held that the loss was a marine risk.

To the same effect was Britain Steamship Co. v. The King, decided by the House of Lords [1921] 1 A.C. 99.

In the same report the House of Lords also decided Green v. British India Steam Navigation Co. and British India Co. v. Liverpool and London War Risk Ass'n. The steamer "Matiana" was in a convoy and was zigzagging in accordance with orders given by the naval officers in charge of the escorting warships. She was in a part of the Mediterranean where it was known that enemy submarines were active, but there was at the time no evidence of the presence of any submarine. While so proceeding, she stranded on a reef and was lost. There was no proof of negligence either by the naval officer in charge or by the navigator of the "Matiana." The House of Lords held that her loss was a marine risk.

It is significant that in all of the numerous cases based on war risk policies the contention has never been advanced that the act of sailing in a convoy constitutes an act of "restraint" even though such sailing was "practically necessary" or even "unavoidable" under war time regulations.

It is regrettable that the attention of the District Court was not directed to the case of Harrisons, Limited v. Shipping Controller [1921] 1 K.B. 122, 4 Ll. L. Rep. 429. [2]

That case considered a number of points involved in the situation under review. In the Harrisons case the S.S. "Inkonka" was escorted by a British destroyer while she was proceeding toward Taranto, Italy. While she was navigating the war regions she sailed without lights under convoy orders. The destroyer ordered the "Inkonka" to follow a pilot escort which had come out of Taranto to escort the vessels into the port. The Court found that the Master of the "Inkonka" would not have attempted to enter the port—the night was dark and stormy—if he had not been given "compelling orders" by the destroyer, "orders he was bound, under severe penalties, to obey." (p. 124) The vessel ran ashore. In holding that the loss was due to a marine peril and not a war risk, the Court made these pertinent observations at page 131:

"* * * In time of war marine risks exist as fully, and perhaps more fully, than in time of peace; and they are none the less marine risks because their details may be coloured or added to, or the danger enlarged, by the existence of wartime conditions. It seems proper to distinguish between wartime conditions of merchantman traffic and the actual occurrence of warlike operations. The imposition of regulations upon merchantmen, whether such regulations be slight or stringent, and whether they be general or specific, does not of itself seem to constitute a warlike operation. If it were otherwise, then it would follow that upon the outbreak of war all British merchant ships became subject to, and participants in, warlike operations, inasmuch as they all fell within

---

[2] Neither counsel cited the Harrisons case here.

the compulsive area of Admiralty regulations. * * *"

And at pages 134, 135:

"* * * The 'Inkonka' was also sailing under convoy of H.M.S. 'Pincher,' and was under enforceable obedience to her. A convoy has been described by Maude and Pollock on Merchant Shipping as 'a naval force, consisting of a ship or ships appointed by the Government, or by the commander of a station, to escort and protect merchant ships proceeding to certain parts.' I presume that a convoy may consist of one war vessel only escòrting a single merchantman. It is now clear from the majority opinion in the Matiana Case ([1921] 1 A.C. 104) that a merchantman under naval convoy, and bound to obey that convoy, is not thereby engaged in a warlike operation. * * *"

The District Court's error in finding a "restraint" flowed from its misapprehension as to the meaning of the word as used in war risk policies. The term "restraint" is a word of art and has a definite and long-established history in admiralty and war risk policies.

"Restraint" as interpreted by the Courts, in this country and in England, means a form of capture, arrest or detainment.

Further, "restraint of princes means the operation of the sovereign power by an exercise of vis major, in its sovereign capacity, controlling and divesting for the time, the dominion or authority of the owner over the ship (citing cases), and in marine and war risk policies restraint of princes applies only to acts done in the exercise of the sovereign power. * * *" Baker Castor Oil Co. v. Insurance Co. of North America, D.C., 60 F.Supp. 32, 35.

The rule was thus stated in The Claveresk, 2 Cir., 264 F. 276, 280:

"The fundamental essential of a restraint of rulers is that the restraining act should be governmental."

In Leyland Shipping Co., Ltd., v. Norwich Union, Ltd. [1917] 1 K.B. 873 (Court of Appeal), it was held, page 896:

"* * * the words 'capture, seizure, detention and the consequences thereof', etc. in the warranty are really equivalent to * * * arrests, restrainments and detainments * * * in the words of the policy." (Emphasis supplied)

It is too well settled to require citation that the burden of proving a loss by a peril insured against is on the insured.

In view of the failure to establish a "restraint" as defined by law the appellee's case must fall.

It is fundamental principle of marine insurance that *causa proxima non remota spectatur*, and that the underwriter is liable for no loss which is not proximately caused by a peril insured against.

The rule was stated as follows in Leyland Shipping Co., Ltd. v. Norwich Union, Ltd., supra, pages 891, 892:

"* * * in deciding whether a loss is occasion by a peril insured against it is the long established rule that the proximate and not the remote cause is to be looked at * * *."

See also the leading English case of Ionides v. Universal Ins. Co., 14 C.B. (N.S.) 259.

The rule has been thus stated as follows by the Circuit Court of Appeals of the Second Circuit in the Queen Ins. Co. of America v. Globe & Rutgers Fire Ins. Co., 282 F. 976, 978:

"In order to impose liability under the war risk clause policy, 'all forms of hostilities or warlike operations of whatever kind' must consist of some form or kind of hostility or warlike operations which have proximately caused the loss. Remote consequences of hostilities cannot become a recoverable loss, even if they may be said to be proximately caused by something itself ascribable as a consequence of hostilities."

Here the appellee was compelled to establish a "restraint" in order to avail itself of the rule that where a "restraint" has taken place any loss which subsequently occurs may be "fairly attributed to the taking" and the party seeking recovery under a war risk policy is relieved from strict compliance with the rule of proximate cause above stated.

The rule applicable to "restraints" was stated as follows in Standard Oil Co. of New Jersey, as owner, etc., of the Steamship Llama v. United States of America, 267 U.S. 76, 77, 45 S.Ct. 211, 212, 69 S.Ct. 519:

"But if a vessel should be taken from an owner's hands without his consent and should be lost while thus held by a paramount power, obviously a company that had insured against such a taking could not look beyond and attribute the loss to a peril of the sea. Whatever happens while the taking insured against continues fairly may be attributed to the taking. That is a non-conductor between the insured and subsequent events."

In the Standard Oil case the vessel was *boarded by an armed boarding party* from a British warship. The lieutenant in charge of the boarding party was directed by the British warship to pursue a certain course and while following these instructions the vessel was lost.

In Muller v. Globe & Rutgers Fire Ins. Co., 2 Cir., 246 F. 759, cited with approval by the Supreme Court in the Llama case, the same rule was applied. The facts in the two cases were almost identical. In the Muller case the vessel was also boarded by an armed party from a British warship and was then directed to proceed in accordance with orders from the warship. The vessel ran ashore and became a total loss. Recovery was allowed on a war risk policy which contained a "restraint" clause similar to that in the instant case.

It is evident from the citation of these two cases by the District Court that it considered their fact situations to be similar to that here. The District Court cited the Standard Oil Co. decision as authority for its ruling that the "restraint" was the "proximate cause" under Mr. Justice Holmes' statement that "Whatever happens while the taking insured against continues fairly may be attributed to the taking."

Applying the rule the District Court said: "There (referring to the Standard Oil case) the Court had before it a 'seizure,' here we have before us a 'restraint'. However, we think the distinction is not material."

In conclusion: as stated at the outset, appellee premised her case on two theories (1) the "restraint," (2) the "Exhibitor's" "abandonment" of the "Maiden Creek" as a "warlike operation."

Our discussion has made it apparent that the record does not sustain either theory —in fact or in law. On the other hand the testimony establishes that the loss of the "Maiden Creek" was not the result of a warlike operation or of any conduct insured against by the war risk policy of the appellant and the libel should have been dismissed.

For the reasons stated the decree of the District Court will be reversed and the cause remanded with instructions to enter a decree in conformity with this opinion.

BIGGS, Circuit Judge, concurs in this result.