12 U.S. 59
 8 Cranch 59
 3 L.Ed. 487
 MCCALL AND AL.
v.
THE MARINE INSURANCE COMPANY
 Feb. 21, 1814
 
 ERROR to the Circuit Court for the district of Maryland.
 This was an action on a policy underwritten by the Defendants, upon all kinds of lawful goods and merchandize, on board the ship Cordelia, on a voyage from the Island of Teneriffe, to Surabaya, and at and from thence to Philadelphia, warranted American property. The ship sailed on the voyage, on the 5th of April, 1811, having on board a cargo of lawful goods, the property of the Plaintiffs, of the value of 15,000 dollars, and pursued the voyage until the 18th of July following, when, being in a place called Madura Bay, within about twelve hours sail of Surabaya, she was boarded by an officer of a British frigate, forming one of a squadron, then actually blockading the port of Surabaya, and all the other ports of the islands of Java and Madura. The frigate took possession of the Cordelia, and conducted her to the admiral commanding the blockading squadron, who, on the next day, dismissed the Cordeila, after indorsing her papers, and warning the master not to enter the port of Surabaya, or any other port in the island of Java, or of the island of Madura, on pain of capture. On the same day, the Cordelia made another attempt to enter Surabaya, but was chased by the same British frigate, and taken possession of a second time. After being detained two days, the Cordelia, was again released, and the master was ordered to depart instantly from the coast of Java, and the neighborhood of Surabaya, upon penalty of capture, and impressment of his men. The master, finding it impracticable to pursue his voyage further, resolved to return to Philadelphia, where he arrived on the 19th of November, 1811. At the time of sailing on the voyage from Teneriff, the blockade of Java was unknown to the parties. The Plaintiffs abandoned to the Defendants, immediately after the arrival of the Cordelia at Philadelphia, which gave them the first knowledge of the occurrences. The Defendants refused to accept the abandonment.
 The policy contained the usual risks, except that the word 'unlawful,' was printed before 'arrests,' so that the clause stood, 'unlawful arrests, restraints, and detainments of all kings, princes, or people of what nation, condition or quality soever.' The declaration alleges, that the ship and cargo were, during the voyage, 'by persons acting under the authority of the British government, and by a certain ship of war belonging to that government, unlawfully seized, restrained, and detained,' and thereby become totally lost.
 The Circuit Court directed the jury, that, on this state of facts, the Plaintiffs were not in law entitled to recover; to which the Plaintiffs excepted and brought this writ of error.
 HARPER, for the Plaintiffs,
 Insisted that this direction was erroneous; because the voyage was broken up, and lost.
 1st. By men of war;——
 2d. By detention of princes; the blockade having prevented the accomplishment of the voyage.
 That the Plaintiffs had therefore a right to abandon, and were entitled to recover for a total loss.
 In support of his argument, he cited the case of Barker v. Blakes, 9 East, 280, cited also in 2 Marshall, 835, Appendix.
 JONES, contra.
 This case is very distinguishable from that of Barker v. Blakes.
 1st. In that case, the voyage was interrupted as to the ultimate and only port of destination. Here, there was an interruption as to an intermediate port only, which cannot, we contend, constitute a total loss. The adventure from Teneriffe to Philadelphia, might have been as profitable as the accomplishment of the whole voyage.
 Another distinction between the two cases arises from the different phraseology employed in the respective policies. The English policy employs general words, so as to include any detention of princes, &c. Here, the policy is limited to unlawful detention of princes, &c. Unless, therefore, this detention can be shown to be unlawful, the case is not within the policy; and it is clear, that it was not unlawful, unless the blockade was so. But this is not contended; the blockade was maintained by an adequate force, and was in every respect conformable to the law of nations.
 Again, in the case of Barker v. Blakes, the blockade of Havre was not considered as the cause of the destruction of the voyage; the detention in Bristol, was the only ground of loss. Here, on the contrary, the blockade is the sole ground of abandonment.
 The abandonment itself, in the case now before the Court, is liable to objection. An abandonment, to be valid, ought to be made during the impediment that causes the loss. But in this case, the abandonment was not made till long after the impediment had ceased.
 PINKNEY, same side.
 It was contended by the Defendants in the Court below, that they were not liable for the loss in this case,
 1st. Because, under the words of the policy, that loss did not arise from any peril insured against
 2d. Because the Plaintiffs had violated their warranty of neutrality.
 3d. Because at the time when the abandonment was made, the property was not under the restraint of princes.
 The same grounds of defence are now relied upon.
 And, first, as to the words of the policy. This instrument insures against 'unlawful arrests, restraints and detainments of all kings, &c. The word 'unlawful' is that which the Defendants consider as taking the present case out of the policy. This word is not inserted in the English policies, but has been introduced into those of the Marine Insurance Company and some other American offices. Some meaning must be given to the term, and that can be no other than the most usual meaning; so that unless it can be made to appear that the detainment in this case was unlawful, the Defendants cannot be considered as liable. But, as has been said before, the blockade, which was the cause of the detainment, was lawful; the detainment itself was therefore lawful, under the acknowledged law of nations.
 2d. As to the warranty of neutrality.
 When the voyage was undertaken, and the policy underwritten, neither party knew that the port of destination was blockaded; but the underwriters protected themselves by a warranty of neutrality, and the assured consented to give it.
 The import of the warranty is that the voyage shall be performed in a neutral manner; and, consequently, that if the vessel should find the port blockaded, she will discontinue the voyage. She does find it blockaded; and not only physical force, but the law of nations and the warranty oblige her to forbear the completion of the voyage. She nevertheless attempts to enter the port, and that, too, after being warned off by the admiral commanding the blockading squadron. Has the assured in such a case, a right to set up the compliance with his own warranty as the foundation of a total loss, or of any loss? With such a warranty in the policy, can the underwriter be considered as engaging that, if the port of destination should be found blockaded, the voyage shall be completed? If such is his engagement, then he stipulates that the vessel shall violate the warranty; because without a violation of it, she cannot reach her port of destination, if she finds it blockaded. It is plain that his undertaking is only for a neutral voyage; and, therefore, that, the moment it becomes unneutral, the policy is discharged by force of the warranty acting upon the whole contract.
 Cases upon the British orders in council are far less strong than this; for they made no blockade acknowledged by the law of nations. Physical force was there every thing; and neutral duties were not affected by them. But here, the neutral obligations of the vessel turn her back, and intercept her path, and extract the case out of the policy.
 3d. Here was no restraint of princes. Restraint must be physical; and an abandonment, to be of any avail, must be made during such restraint. In the present case the physical restraint continued but one day; all afterwards was mere moral restraint, arising from the threat of capture and confiscation as prize of war. But an apprehension, though just and reasonable, is not sufficient to justify an abandonment. 3, Bos. and Pul. 392, Hadkinson v. Robinson. 5, Esp. Ca. 50. 1, Campbell, Black v. Hagen. See, also, the case of _____ _____ 6, Mass. T. R. 118, where the Court decided that apprehension alone would not justify an abandonment; and, also, that if the master, after being once warned off, had made another attempt to enter the blockaded port, it would have been barratry.
 HARPER, in reply.
 1st. With regard to the wording of the policy. It is unnecessary to examine what effect the term, 'unlawful,' may have upon the subsequent words, inasmuch as the declaration states the loss to have been occasioned by men of war, with which the word 'unlawful' had no connexion. But if such examination be made, it will appear that this term applies only to the word 'arrests,' which, in the original printed form of the policy, was separated from the following part of the sentence by a comma, and was therefore the only word qualified by the preceding term 'unlawful.' The pointing of the sentence was the act of the parties, and, as sach, material, and as much a part of the contract as the words themselves.
 2d. As to the violation of the warranty of neutrality. The loss was complets before the second attempt to enter the blockaded part; and therefore could not have happened by reason of that attempt; consequently, the right of the Plaintiffs to recover, could not be affected by that or any other act of the master, subsequent to the original loss, however inconsistent with neutrality that act might be.
 3d. With regard to the time of abandoning: the Plaintiffs abandoned immediately after the arrival of the Cordelia at Philadelphia, which gave them the first information of the loss. To have expected them to abandon before they knew any thing of the loss would have been absolutely inconsistent with reason.
 The cases cited from Bos. and Pul. and the Mass. T. R. are essentially different from the present, inasmuch as in those cases, there was no physical force to prevent the prosecution of the voyage. Park. 226, (6th Ed.) Blacketshager v. the London Assurance Company.
 Monday, February 21st. Present all the Judges.
 STORY, J. after stating the facts of the case, delivered the opinion of the Court as follows:
 
 
 1
 The Court below, at the trial, held that the Plaintiff, under the circumstances, was not entitled to abandon as for a total loss; and the correctness of that opinion remains for the decision of this Court.
 
 
 2
 Whether the turning away of a ship from the port of destination in consequence of a blockade, be, in any case, a good cause for abandonment, so as to entitle the assured to recover from the underwriter as for a total loss by the breaking up of the voyage; and, if so, whether the doctrine could apply to a policy with a warranty of neutrality, the legal effect of such warranty being to compel the party to abandon the voyage, if it cannot be pursued consistent with neutrality, are questions of great importance, upon which the Court do not think it necessary to express any opinion, because this cause may well be decided upon an independent ground.
 
 
 3
 The loss of the voyage, in the case at bar, was occasioned (if at all) by the arrest and restraint of the British blockading squadron. The right to blockade an enemy's port with a competent force, is a right secured to every belligerent by the law of nations. No neutral can, after knowledge of such blockade, lawfully enter, or attempt to enter, the blockaded port. It would be a violation of neutral character, which, according to established usages, would subject the property engaged therein to the penalty of confiscation. In such a case, therefore, the arrest and restraint of neutral ships attempting to enter the port is a lawful arrest and restraint by the blockading squadron. It would follow, therefore, from this consideration, that the arrest and restraint, on account of which a recovery is now sought, is not a risk within the policy against which the under writer has engaged to indemnify the Plaintiff.
 
 
 4
 But it is contended by the counsel for the Plaintiff, in order to escape from this conclusion, that the word 'unlawful,' in the policy, is confined in its operation to arrests, and does not extend to 'restraints and detainments.' To this construction the Court cannot assent. The grammatical order of the words and the coherence of the sentence require a different construction. It is not against every 'unlawful arrest' that the underwriter undertakes to indemnify, but against 'unlawful arrests, &c. of all kings, princes, and people,' which have always been held to mean the arrests of kings, princes, or people, in their sovereign and national capacity, and not as individuals. The necessary connexion of the sentence, therefore, requires that 'arrests, restraints and detainments,' should be coupled together; and, if so, the qualification of unlawful must be annexed to them all. The intent of the parties, also, urges to the same conclusion; for every arrest is a restraint and detainment; and it would be strange if the party could, under the allegation of a restraint, recover a loss from which the underwriter is expressly exempted by an unambiguous-exception in the policy.
 
 
 5
 On the whole, the Court are of opinion that the judgment of the Circuit Court must be affirmed.