**REINOLD v. UNITED STATES.**

No. 106, Docket 20730.

Circuit Court of Appeals, Second Circuit.

April 29, 1948.

John F. X. McGohey, U. S. Atty., of New York City (Edward L. Smith, Sp.

Asst. to Atty. Gen., and Benjamin H. Berman, Sp. Atty., Department of Justice, of Washington, D. C., of counsel), for the United States.

Frederick R. Graves, of New York City, for Mary Louise Reinold, libellant-appellee.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

Libellant, Mary Louise Reinold, is the beneficiary under a Crew Life and Injury Policy of Insurance issued by the War Shipping Administration covering the master, officers and crew of M/V Baltic. The sole issue is whether the death of Ernest F. Backus, the chief officer of the vessel, who was shot and killed on board by a drunken armed guard resulted from a peril insured against.

The Baltic was of Panamanian registry, was operated by the Panama Transport Company, and was under a time charter to the War Shipping Administration. She had aboard a cargo of crude oil destined for Montevideo, which was loaded at La Libertad, Ecuador, and consigned to Administracion Nacional de Combustibles, Alcohol y Portland of the Government of Uruguay. While the vessel was in the harbor of Montevideo, discharging her cargo, she was equipped with machine guns and had aboard an Armed Guard consisting of an ensign and naval personnel who had come on the vessel at Miami. Such an Armed Guard was in conformity with the usual practice aboard merchant vessels chartered by the United States during the recent war.

On the evening of June 29, 1943, the master of the Baltic and the commanding officer of the Armed Guard were ashore, and the chief officer Backus was left in charge of the merchant crew, and Pendarvis —gunner's mate—was left in charge of the gun crew. About 8 P.M. Williams and Brown of the merchant crew came aboard with a quart of whisky and asked Rosborough, a member of the gun crew who was on gangway watch, to drink with them. Rosborough was relieved from his watch, and he, Williams and Brown went below

and Rosborough drank most of the quart of whisky and became drunk. Backus and Rosborough got into a fight. Pendarvis attempted to break up the fight and put Rosborough to bed three times. Finally, Rosborough went about looking for a knife which he did not get, went on the bridge, and was seen near the starboard machine gun. From there he fired a burst in the air, whereupon Phillips of the Armed Guard, Williams of the merchant crew, and Backus, the chief officer, proceeded to the bridge and Williams got one arm around Rosborough's neck and seized his left arm, while Phillips and Backus approached to assist. At this Rosborough fired a burst on the gun, while Williams continued to struggle with him; Backus was struck by the fire and killed almost instantly. Thereafter the libellant, the beneficiary in his insurance policy, sued the United States under the Suits in Admiralty Act to recover $5,000 as the amount named in the policy payable for loss of life of the insured by reason of risks enumerated in the following clause of the policy:

"Against loss of life and bodily injury to the master, officers, and crew (including within the term 'crew' licensed and unlicensed seamen, including radio operators and cadets) directly occasioned by capture, seizure, destruction by men of war, piracy, takings at sea, arrests, restraints and detainments and other warlike operations (including collisions in convoy but with reservation of subrogation rights under owner's marine policies or against other colliding vessel, in the event it is determined that such collision is attributable to marine causes) and acts of kings, princes, and peoples in prosecution of hostilities or in the application of sanctions under international agreements, whether before or after declaration of war and whether by a belligerent or otherwise, including factions engaged in civil war, revolution, rebellion or insurrection, and including the risks of aerial bombardment, floating or stationary mines, and stray or derelict torpedoes."

The District Judge found that "Backus, while in the performance of his duty, was shot and killed and that the proximate cause of his death was the restraint exercised by the U. S. Navy while said vessel was engaged in warlike operations." In our opinion the proximate cause of the death was not either a restraint or any other enumerated or contemplated risk covered by the policy.

The Wartime Instructions for United States Merchant Vessels were in evidence and so far as pertinent for our consideration contained the provisions set forth in the margin.[1] It appears from these "Instructions" that the commander of the Armed Guard is the "military adviser" of

[1] 1902. When an Armed Guard is placed aboard a merchant vessel, the following instructions shall be strictly followed. A naval liaison group will be governed by the same instructions.

(a) The armed guard is commanded by a naval officer or petty officer detailed for that duty. He shall have exclusive control over the military functions of the Armed Guard and shall be responsible for the execution of all the regulations under which it functions.

(b) The Armed Guard shall be subjected to the orders of the master of the merchant vessel as to matters pertaining to internal organization, but the members of the Armed Guard shall not be required to perform any ship duties except their military duty, and this shall be performed invariably under the direction of the commander of the Armed Guard.

(c) The military discipline of the Armed Guard shall be administered by the Commander of the Armed Guard.

(d) The decision when to open fire is the responsibility of the Armed Guard commander since that officer is charged with the defense of the ship. * * *

(f) The commander of the Armed Guard attached to a merchant vessel is the master's military adviser and represents the Navy Department. In accordance with law, the master commands the vessel and is charged with her safe navigation and the safety of all persons on board. A commissioned officer, as the commander of the Armed Guard, is expected to be quartered and messed on board, both at sea and in port, in a manner appropriate to a ship's officer. He will reimburse the owners direct for subsistence.

(g) The master of the merchant ship shall, on request of the commander of the Armed Guard, detail members of the crew to handle ammunition, clear decks, and otherwise supplement the service of the guns.

* * * * * *

the master of the vessel, that the latter "commands the vessel" and is charged with "the safety of all persons on board," and also that the Armed Guard is "subjected to the orders of the master of the merchant vessel as to matters pertaining to internal organization." The partial independence of the Armed Guard with respect to such matters as military discipline was not in our opinion sufficient to constitute a "restraint" of the vessel as that word is used in the policy. The master retained his general and traditional control over the vessel and the Armed Guard was furnished not to direct the master's management of his ship but to protect it from attacks by the enemy. Minor limitations of his authority occasionally necessitated by the presence of the Armed Guard did not constitute that paramount control of the operations of the vessel signified by the term "restraint."

In Crist v. United States War Shipping Administration, 163 F.2d 145, the Third Circuit recently held that where a merchant vessel sailed in convoy she was not thereby under restraint within the meaning of an insurance policy like the present. Indeed the court said in its opinion in that case, 163 F.2d at page 151: "It is significant that in all of the numerous cases based on war risk policies the contention has never been advanced that the act of sailing in a convoy constitutes an act of 'restraint' even though such sailing was 'practically necessary' or even 'unavoidable' under war time regulations." The 12th Edition (1939), §§ 832–835a, of Arnould's book on Marine Insurance states that there is no significant distinction between "arrests, restraints and detainments" and in discussing various aspects of these terms includes only such types as embargoes, blockades and seizures in which a government assumes general control over the movements of a vessel. Illustrative of the proper meaning of "restraint" is the decision in Standard Oil Co. of New Jersey v. United States, 267 U.S. 76, 45 S. Ct. 211, 212, 69 L.Ed. 519. There a British naval officer and armed party had boarded a Standard Oil tanker and directed the master to proceed to Kirkwall, Scotland. Justice Holmes, who wrote the opinion, said that there was a paramount control by the boarding party over the vessel which he described as "taken from an owner's hands." That paramount control was held to constitute a "restraint" within the meaning of an insurance policy providing for payment of losses from war risks similar to those provided for in the policy involved in the case at bar. As compared with the above applications of the term "restraint," we find here only a most limited interference with the conventional control of the master of the vessel, and even that interference generally limited to the naval officer's authority over the members of the Armed Guard and its function as a military protector of the ship.

Risks insured against in the policy under consideration included not only "restraints," which we have already held to be a term inapplicable to the present case, but also included "other warlike operations" and "acts * * * in prosecution of hostilities." In Queen Ins. Co. v. Globe Ins. Co., 263 U.S. 487, 44 S.Ct. 175, 176, 67 L.Ed. 479, the policy insured against "all consequences * * * of hostilities or warlike operations." The loss occurred while the vessel was in a convoy sailing with screened lights, protected by British, Italian and American war vessels and subject to the command of a naval officer, and resulted from a collision with a British steamship in another convoy similarly commanded which met the first convoy in the dark. The Supreme Court held in an opinion by Justice Holmes that the loss was not attributable to warlike operations within the meaning of the policy, following the decision of British Steamship Co. v. The King, [1921] 1 A.C. 99. That decision involved a loss of the cargo of a vessel sailing without lights because of Admiralty Regulations which collided with another vessel also sailing without lights. There was no negligence on the part of either vessel and each was considered engaged in a peaceful mission. The House of Lords held that the vessels were not engaged in a warlike operation and that the loss was due to a marine and not to a war risk. In Queen Ins. Co. v. Globe Ins. Co. it was also held that irrespective of whether the vessels were engaged in "warlike operations" such an engagement could not be considered the proximate cause of the loss.

In spite of the vague and inconclusive attempts of the courts to define proximate cause, the loss here cannot be thought to be directly occasioned by "warlike operations" under any judicial definition. It was immediately due to a drunken brawl and not to anything normally occurring as the result of the presence on the vessel of an Armed Guard or within the reasonable contemplation of the parties to the policy. It is to be remembered that Rosborough in his passion first tried to find a knife and his resort to any weapon was not in the line of duty, and the man then in command of the guard did his best to prevent his murderous action. In other words, warlike operations were not the factor bringing about the harm. Crist v. United States War Shipping Administration, supra; Dennehy v. United States, D.C.S.D.N.Y., 15 F.2d 196. The same absence of causal relation applies as to both "warlike operations" and "acts in prosecution of hostilities." If there be any distinction between those two provisions of the policy when applied to the facts of the case at bar it seems clear that neither had any foreseeable relation to the cause of libellant's death.

For the above reasons the decree is reversed and the cause remanded with directions to dismiss the libel.