**DARANOWICH v. LAND et al.**

**No. 56, Docket 21759.**

United States Court of Appeals
Second Circuit.

Argued Nov. 3, 1950.

Decided Jan. 15, 1951.

Frank, Circuit Judge, dissented.

Maurice A. Krisel and Krisel & Beck, all of New York City, for appellant.

Irving H. Saypol, U. S. Atty., New York City, Benjamin H. Berman and Howard F. Fanning, Attorneys, Department of Justice, New York City, of counsel, for appellee.

Before L. HAND, Chief Judge, and SWAN and FRANK, Circuit Judges.

SWAN, Circuit Judge.

This is a suit upon an insurance policy issued by the War Shipping Administration insuring the life of Vladimir Trushko who was a member of the crew of the S. S. Africanda, a merchant vessel owned by the United States. The issue below and on appeal is whether Trushko's death was within the coverage of the policy.

While proceeding in a convoy from Scotland to Murmansk, the Africanda was sunk by enemy torpedoes on September 13, 1942. Trushko jumped into the sea and was taken aboard a life boat, from which he was transferred first to a minesweeper, then to a coastal "rescue ship," and finally to the British destroyer Milne. The Milne returned to Iceland, where she remained for a few hours, and then set out for Scotland. On September 22, 1942 shortly after leaving Iceland, a general alarm was sounded when Trushko and a British sailor were washed overboard. The Milne stood by to search for them but they were not seen and she proceeded on her voyage. On these facts the district court held that Trushko's death was not within the coverage of the insurance policy.

Clause A of the policy insures against loss of life "directly occasioned by * * * warlike operations," with a proviso "That in case of destruction or abandonment of said vessel from the causes specified in this Clause A, said master, officers, and crew shall continue to be insured against the risks herein specified until they have reached a safe vessel or some other place of safety, whereupon insurance hereunder shall cease except to the extent of the insurance provided in Clause B hereunder."

Clause B provides

"In the event of * * * the destruction or abandonment of the vessel resulting from * * * warlike operations * * * the insurance herein provided shall be extended."

"*During* the period commencing with * * * the arrival upon a safe vessel or at some other place of safety * * * and

terminating upon arrival of the seaman at a continental United States port.

"*Against* loss of life and bodily injury to the master, officers, and crew directly occasioned by warlike operations * * *"

The district judge expressed the opinion that the minesweeper, coastal vessel and British destroyer were seaworthy and "safe" vessels within the meaning of the policy. The appellant contends that the words "safe vessel" should not be interpreted to mean a seaworthy vessel but rather a vessel in "safe" waters, *i. e.* removed from the war-risks against which the policy was intended to afford protection; and that under such interpretation the Milne was not a "safe vessel" because her voyage from Iceland to Scotland was through a dangerous war zone. It would seem that the more liberal interpretation for which the appellant contends would best carry out the purposes of the policy, but decision of the question is not essential in the present case. If Trushko had not arrived upon a safe vessel, Clause A of the policy still covered; if he had, the coverage of Clause B was not to terminate until his arrival at a continental United States port. Under either clause the decisive issue is whether his death was "directly occasioned by warlike operations."

In United States v. Standard Oil Co., 2 Cir., 178 F.2d 488, affirmed 340 U.S. 54, 71 S.Ct. 135, where the question was whether marine or war risk underwriters should bear a loss, we stated "the American rule to be that under a policy which expressly insures against war risks or 'all consequences of hostilities or warlike operations,' the coverage extends only to perils due directly to some hostile action, military maneuver, or operational war danger, and does not include the aggravation or increase of a maritime risk because of war operations". 178 F.2d at page 493. The appellant urges that the policy in suit should be more liberally construed in favor of the seaman, as stated in Admiral Land's report dated October 17, 1945.[1] Granting that such policies should be gently treated,

1. See Hearings before Committee on The Merchant Marine and Fisheries on H. R. 3500, 79th Cong., 1st Sess., Part 2, page 443, Document No. 64.

nevertheless they still remain marine insurance and the stipulations they contain were intended to limit the Government's liability. Liability is not assumed for every death however caused, even though it would not have happened if the seaman had not been a member of the crew. Thus in Reinold v. United States, 2 Cir., 167 F.2d 556, certiorari denied 335 U.S. 824, 69 S.Ct. 48, 93 L.Ed. 378, we held that the death of an officer killed by a drunken member of the gun crew was not within the coverage of a policy like the one in suit. See also Crist v. United States War Shipping Administration, 3 Cir., 163 F.2d 145, certiorari denied 332 U.S. 852, 68 S.Ct. 352, 92 L.Ed. 422. "Directly occasioned" means more than in any way connected with conditions bringing about death. Even should we hold that the Milne was engaged in a warlike operation while proceeding from Iceland to Scotland through waters made hazardous by submarines, nevertheless the policy would not have covered the loss, if Trushko had died from a blow from some part of the vessel that had been carried away in heavy weather. In such event the warlike operation would not have been the "proximate cause" of his death, i. e. would not have "directly occasioned" it. Nor was it the proximate cause of his being swept overboard.

The appellant particularly relies upon the interpretative resolution of March 22, 1944 adopted by the Maritime War Emergency Board. This resolution states that the Board "finds the following administrative policy will carry out the intent of the Board in adopting its aforementioned Decisions, to wit: allowance of claims for loss of life and bodily injury under the aforementioned insurance policies issued by War Shipping Administration pursuant to the aforementioned Decisions of this Board, where full evidence of the cause of the casualty insured against is not available or where evidence of the cause of the casualty is reasonably open to conflicting inferences, if in the determination of the Administrator the operations of war have substantially contributed to the casualty and payment is required to make equitable provision for the seaman or his dependents." We find no evidence in the record to bring the case within this resolution. The appellant argues that the insured's risk of being washed overboard was a war risk because it was a peril created by the high speed of the British destroyer in a dangerous war zone. A witness who was aboard the Milne testified that the sea was very rough. In response to a question by the court as to the height of the waves, he replied: "They were going over the ship sometimes because he had speed." We see nothing in this statement to support an inference that the destroyer was going at a higher speed than she would have been making in such weather if there had been no war. The appellant argues that the Milne was proceeding at high speed, that such speed was put on the vessel because she was in dangerous waters, and that the added speed caused her decks to be awash and this caused the deceased to have been washed overboard. But there is absolutely no proof of any such chain of events.

If the resolution means that the burden is on the insurer to prove that the operations of war have *not* contributed to the casualty, it is true that no such proof was made by the insurer. Indeed, there would be few cases where the insurer could so prove if the insured was killed within the war area. We do not read the resolution as reversing the ordinary burden of proof; nor, if it does go so far, would it be legally binding on the courts. It is only an intradepartmental directive. The plaintiff failed to prove that Trushko's death was "directly occasioned by warlike operations." Accordingly the decree of dismissal is affirmed.

FRANK, Circuit Judge (dissenting).

1. The policy before us here, the so-called Crew and Life Policy, issued pursuant to the War Risk Insurance Act of June 29, 1940, 46 U.S.C.A. § 1128,[1] has a history (1) which markedly differentiates it from the policy involved in Standard Oil Company of New Jersey v. United

---

1. As revised by Act of April 11, 1942, 56 Stat. 214.

States, 340 U.S. 54, 71 S.Ct. 135, 139 (*i. e.,* a policy insuring against liability or loss of, and damage to, the vessel [2]) and (2) which was not brought to the attention of the courts which decided the cases cited by my colleagues.

The policy, by its literal terms, covers "loss of life * * * directly occasioned by * * * warlike operations." *However, the government, in its amended answer to the libel, admitted that this insurance was to be construed "as per decisions of the Maritime War Emergency Board."* [3] Decisions of that Board issued in December, 1941, and February 6, 1942, interpreted "warlike operations" to include "risks of war." [4] On April 4, 1944, Admiral Land, the War Shipping Administrator, interpreted the word "directly" to "include proximate as well as direct causation." [5]

By Decision No. 3, issued January 20, 1942, the Maritime War Emergency Board provided for reimbursement for loss or damage to personal effects of seamen similarly resulting "from risks of war or warlike operations." By Decision No. 8, issued March 23, 1942, interpreting Decision No. 3, the Board included, in the covered risks, casualties resulting from "navigation in weather conditions not normally undertaken, and venturing over hazardous routes * * * and the exigencies of wartime necessity or operation," although the Board "recognized that such casualties do not arise from 'risks of war' or 'warlike operations,' in the strict technical sense as the terms are used in insurance policies or interpreted by the courts."

More important is the following: On March 22, 1944, the Maritime War Emergency Board adopted a "resolution" which said, "In these cases where the operations of war appear to have substantially contributed to the casualty insured against, it appears proper to resolve doubts in favor of the claimant and to make payments where such action is consistent with broad policy considerations, even though the claim may be doubtful under the strict contractual provisions of the insurance policy." The Resolution, after citing Board Decisions issued in December 1941 and February 1942, stated that the Board "finds the following administrative policy will carry out the intent of the Board in adopting its aforementioned Decisions, to wit: allowance of claims for loss of life and bodily injury under the aforementioned insurance policies issued by War Shipping Administration pursuant to the aforementioned Decisions of this Board, where full evidence of the cause of the casualty insured against is not available or where evidence of the cause of the casualty is reasonably open to conflicting inferences, if in the determination of the Administrator the operations of war have substantially contributed to the casualty and payment is required to make equitable provision for the seaman or his dependents."

Administrator Land approved this Board "resolution" in a memorandum of April 4, 1944, which stated: "The Crew Life and Injury Policy contained no coverage for losses resulting from marine risks, and was limited to losses 'directly caused' by risks of war and warlike operation. The phrase

---

2. The Supreme Court, in interpreting that policy, spoke of "considerations of business * * * practices." It cited General Mutual Insurance Co. v. Sherwood, 14 How. 351, 362, 14 L.Ed. 452, where, with reference to a similar policy, the Court spoke of "merchants, underwriters * * * and * * * the mercantile world."

3. The Board was established pursuant to a proposal, dated December 18, 1941, by "the personnel of the vessels of the American Merchant Marine and the operators of those vessels." In order to avoid strikes by maritime workers which would cripple the war effort, the Board

was constituted the final arbiter "whenever any difference shall arise between any steamship operator and any union representing its employees with regard to any question relating to war-risk compensation or war-risk insurance of personnel of the vessels of such steamship operator and such question shall not be settled through the ordinary procedure of collective bargaining. * * * "

4. Maritime War Emergency Board Decision No. 1 (December 22, 1941) and Supplement to Decision No. 1 (February 6, 1942).

5. As to this, see *infra.*

'directly caused' was construed to include proximate as well as direct causation * * In addition to cases wherein the cause of the casualty could not be said to be a risk of war, within the meaning of judicial decisions, or to have been the direct or proximate result of such a risk, as proximate causation has been defined by the courts, there have been still other cases where the coverage appeared to be doubtful because of the lack of full evidence of the cause of the casualty, or because such evidence of causation was open to conflicting inferences. * * * The General Counsel has advised that by virtue of the Board's resolution, the legal objections which have heretofore prevented payment in cases by reason of technical definitions of war risk and proximate causation must be withdrawn, and that it now becomes the obligation of the War Shipping Administration to make payments under the policies 'where full evidence of the cause of the casualty insured against is not available or where evidence of the cause of the casualty is reasonably open to conflicting inferences, if in the determination of the Administrator the operations of war have substantially contributed to the casualty and payment is required to make equitable provision for the seaman or his dependents.' "

By a letter dated October 17, 1945, *Admiral Land submitted to a House Committee* (in connection with hearings on bills providing for "Benefits to Merchant Seaman") a memorandum showing the action taken by the War Shipping Administration in dealing with death claims.[6] This memorandum stated in part: "Shortly after the attack on Pearl Harbor an agreement was reached between the operators and representatives of the maritime labor unions. This agreement was embodied in the statement of principles and provided for the creation of the Maritime War Emergency Board. The Board, the members of which were appointed by the President, was to exercise those functions dealing with war-risk insurance and war-risk compensation necessary to bring about a uniform war labor policy in the shipping industry. In order to facilitate the accomplishment of its objectives, it was agreed that any action taken by the Board should supersede provisions in existing collective bargaining agreements and be binding on the signatories. The War Shipping Administration as the owner and operator of an ever-increasing portion of the American merchant marine became a signatory to the statement of principles * * *. In order to give seamen and their dependents the ultimate insurance benefits under the decisions of the Maritime War Emergency Board and the policies provided by the War Shipping Administration under the statutes, *the Board and the Administration concurred in a resolution* adopted March 22, 1944, to liberally interpret the policies, facts and circumstances of each case. Consequently no case is rejected if it is possible to draw a conclusion [that] operations of war or associated marine perils contributed to the casualty."

Admiral Land's memorandum (submitted to the House Committee) went on to discuss, in considerable detail, many "claims for death" reviewed "as of June 30, 1945," to "which were applied the liberal interpretations prescribed by the resolution." He reported cases in which "although [the Administrator was] unable to state that operations of war were the direct cause of the particular condition resulting in death, [he] was also unable to state positively that operations of war had no connection therewith, and consistently with the terms of the resolution * * * it was felt that the beneficiary of the deceased should be given the benefit of every possible inference, and that, therefore, payment should be made of the war risk insurance." Payment, he reported, was also made in "cases of men killed while ashore during a blackout under circumstances justifying the inference that the blackout may have contributed to their death." In still other

---

6. See Hearings Before Committee on the Merchant Marine and Fisheries on H. R. 3500, 79th Cong., 1st Sess., Part 2, pages 443–448, House Doc. No. 64.

cases, claims were allowed because "it was felt that operations of war may in some way have contributed to the deaths," or because "although the cause of death was unknown, one could not rule out the contribution to the death by operations of war." Claims were rejected only when "it was not possible * * * to show that operations of war had even the most remote connection" with the deaths.

These administrative interpretations show that the burden of proof (a) is not (as my colleagues say) on the appellant to prove that the death resulted from a war risk, but (b) is on the appellee to show that the war risks "were not in any way connected with the conditions bringing about death," or that "although the cause of death was unknown, one could not rule out the contribution to the death" by the war risk.[7]

My colleagues refer to the "interpretative resolution" of the Maritime War Emergency Board as "only an intradepartmental directive." They ignore these facts:

(1) The respondent in his answer to the libel admitted the allegation of the libel that the policy in suit is to be construed "as per decisions of the Maritime War Emergency Board."

(2) The respondent, Admiral Land, as Administrator of the War Shipping Administration, concurred in that resolution.

(3) Pursuant to that resolution, in settling claims under such policies, he interpreted this form of policy as putting on the government the burden of proof described above.

(4) He explicitly advised the House Committee of his concurrence in the resolution, and gave the Committee a detailed report of how he had settled claims in that manner.

(5) Congress subsequently amended the statute. Cf. 60 Stat. 937, August 8, 1946, 50 U.S.C.A.Appendix, § 1292(b).[8]

2. It should also be noted that the insurance here is of more or less the same genus as the War Risk Insurance provided for members of the armed forces. Of such insurance, the Supreme Court has said: "The insurance was a contract * * * but it was not one entered into by the United States for gain. * * * the relation of the government to them [the assured] if not paternal was at least avuncular. It was a relation of benevolence established by the Government * * * for the soldier's good."[9] The Court has also said: "* * * these contracts * * were not entered into by the United States for a business purpose. * * * In order to effect a benevolent purpose, heavy burdens were assumed by the Government."[10]

Moreover, the legislation authorizing seamen's war risk insurance was an extension of other legislation designed to protect seamen. Such legislation, in the light of a history which discloses a desire to build up maritime power partly as a matter of national defense—see Hume v. Moore-McCormack Lines, 2 Cir., 121 F.2d 336, 340–347 [11]—has always been construed in favor of seamen with the most striking generosity. Thus, for instance, assumption of risk was held to be no defense to a suit by a seaman under the Jones Act, 46 U.S. C.A. § 688, even though at that time it had been held to be defense to a suit by a railway employee under the identical pro-

7. This burden resembles that imposed on a ship, in a collision or stranding case, where the ship has violated a regulation. In The Pennsylvania, 19 Wall. 125, 136, 22 L.Ed. 148, the burden was said to be that "of showing not merely that * * * [the violation] might not have been one of the causes, or that it probably was not, but that it could not have been." In The Martello, 153 U.S. 64, 75, 14 S.Ct. 723, 727, 38 L.Ed. 637, the Court said that one who violates a regulation must show that the violation "could not by any pos-

sibility have contributed" to the accident.

8. See note 18 as to the inapplicability of the amended statute to the instant case.

9. White v. United States, 270 U.S. 175, 180, 46 S.Ct. 274, 275, 70 L.Ed. 530.

10. Lynch v. United States, 292 U.S. 571, 576: and cf. Id. page 586, 54 S.Ct. 840, 842, 78 L.Ed. 1434.

11. See also, Calmar S. S. Corp. v. Taylor, 303 U.S. 525, 528, 58 S.Ct. 651, 82 L. Ed. 993.

visions of the FELA; The Arizona **v.** Anelich, 298 U.S. 110, 119, 122–123, 56 S.Ct. 707, 80 L.Ed. 1075. So, too, a release by a seaman is treated far more strictly under the Jones Act than is a release given by an employee under the FELA; see Garrett v. Moore-McCormack Lines, 317 U.S. 239, 63 S.Ct. 246, 87 L.Ed. 239, and Callen v. Pennsylvania Railroad Co., 332 U.S. 625, 68 S.Ct. 296, 92 L.Ed. 242. Obviously, this insurance was designed to encourage seamen to take the added risks to which they are subjected in wartime and for which the normal seaman's remedies afford no redress. It seems singularly inappropriate and inconsistent with this purpose, and with the interpretation given this policy by the Government itself, to read into its terms the construction given them in cases involving property damage which are really contests between underwriters.[12]

3. Having in mind, then, the purpose of this insurance and the burden of proof established by the appellee's own interpretation of the policy, consider the undisputed evidence in this case, evidence coming largely from appellee's own witnesses: (a) A "war risk" (*i. e.*, the sinking of the "Africander") led to Trushko's transfer to the "Copeland" and then to the "Milne." (b) Trushko's death occurred in the following circumstances: The "Milne" was a 36.5-knot destroyer. Her decks were close to the waterline.[13] After leaving the ill-fated convoy, she had just stopped at Iceland to pick up a Commodore and was enroute to Scotland through waters then classified by the Maritime War Emergency Board as one of the most dangerous war zones.[14] Indeed, we can take judicial notice of the fact that this area was infested with enemy submarines in September, 1942, the time of Trushko's death. The "Milne" was proceeding at high speed, although the sea was "very rough," and the waves were "going over her because she had speed." It is not at all unlikely that her speed was due either to the dangerous character of the waters, or to the urgency of her war mission, or both. It is common knowledge that it is extremely risky to walk the heaving deck of a destroyer, which rolls heavily at high speed in rough seas, with the decks awash. Had there been no "war risk," it is most unlikely that the "Milne" would have maintained high speed in such weather, thus endangering those on board. In other words (to quote the Board's Decision) here was "navigation in weather conditions not normally undertaken" and a "venturing over hazardous routes." Surely appellee has not discharged the burden of proving (pursuant to the established administrative interpretation of the policy) that war-risks "were not in any way connected with the conditions bringing about the death."

4. This suggestion may be made: That libellant brought this suit shows that the Administrator concluded that the policy did not cover this loss, and this is an administrative interpretation of the policy which binds the courts. To this suggestion, there are these answers: (a) 46 U.S.C.A. § 1128d expressly provides that, if the Administrator rejects a claim, suit may be brought.[15] Accordingly, the Administrator's decision in any particular case is not conclusive. (b) A course of administrative interpretation binds the Government as much as if it were formally embodied in a formal regulation or rule.[16] Especially is

12. See, Standard Oil Co. of New Jersey v. United States, 2 Cir., 178 F.2d 488, 489–490, affirmed 340 U.S. 54, 71 S.Ct. 135.

13. See, Jane's Fighting Ships, 1943–1944 Ed., page 55.

14. The classification was made for war bonus purposes. See, Decision No. 2, issued January 10, 1942, Attachment No. 1.

15. 46 U.S.C.A. § 1128d reads: "In the event of disagreement as to a claim for losses or the amount thereof, on account of insurance under sections 1128–1128h of this title, an action on the claim may be brought and maintained against the United States in the district court of the United States * * *."

16. United States v. Birdsall, 233 U.S. 223, 231, 34 S.Ct. 512, 58 L.Ed. 930; Haas v. Henkel, 216 U.S. 462, 480, 30 S.Ct. 249, 54 L.Ed. 569; cf. United States v. MacDaniel, 7 Pet. 1, 14, 8 L.Ed. 587.

this true when this interpretation is reported to Congress which then amends the statute. (c) When an administrative officer has adopted such a regulation or rule, whether formally or informally, he may not, without openly abandoning it in general, arbitrarily depart from it in particular cases.[17] (d) The statute applicable here does not provide that the administrative decisions in particular cases should be final.[18] Even where a statute does so provide, nevertheless the courts will disregard such a decision if it is arbitrary or capricious.[19]

5. Crist v. United States War Shipping Administration, 3 Cir., 163 F.2d 145, is probably distinguishable on its facts, but contains some dicta unfavorable to appellant here. However, a study of the briefs and record in the Crist case reveals that the administrative interpretation of the policy was not called to the court's attention. This is also true of Reinold v. United States, 2 Cir., 167 F.2d 556. Moreover, that case is not at all in point: There the seaman was killed, while the ship was in port, by a burst from a machine-gun fired by a member of the Navy gun crew during a drunken brawl; the brawl, not any war risk, caused the loss.

**17.** Sheridan-Wyoming Coal Co. v. Krug, 84 U.S.App.D.C. 172, 172 F.2d 282, 287–288; Bartee v. United States, 6 Cir., 60 F.2d 247, 250; Matter of Consumer's Power Co., 6 S.E.C. 444, 457, 477; United States ex rel. Knauff v. McGrath, 2 Cir., 181 F.2d 839, 841; Mastrapasqua v. Shaughnessy, 2 Cir., 180 F.2d 999, 1002; cf. Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220.

Note the Administrative Procedure Act, 5 U.S.C.A. § 1009(e) as to the duty of a court reviewing administrative conduct; "It shall * * * set aside * * * action * * * found to be (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

**18.** The Act of March 24, 1943, 57 Stat. 45, 47, as amended by Act of August 8, 1946, 60 Stat. 937, 50 U.S.C.A.Appendix, § 1292(b) amended the War Risk Insurance Act to authorize inclusion in that insurance of losses due to "marine risks and perils," and permitted this added coverage

to be made retroactive, "if the Administrator finds that such action is required to make equitable provision for loss or injury related to the war effort and not otherwise adequately provided for * * *. The declarations, findings, and actions of or by the Administrator under this subsection shall be final and conclusive."

Since, in the instant suit, no claim is asserted under the retroactive "equitable provision" as to the added coverage, that amended provision is not applicable here.

**19.** Silberschein v. United States, 266 U.S. 221, 225, 45 S.Ct. 69, 69 L.Ed. 256; Ma-King Co. v. Blair, 271 U.S. 479, 483, 46 S.Ct. 544, 70 L.Ed. 1046; Dismuke v. United States, 297 U.S. 167, 172, 56 S. Ct. 400, 80 L.Ed. 561; American School of Magnetic Healing v. McAnnulty, 187 U. S. 94, 110, 23 S.Ct. 33, 47 L.Ed. 90; Degge v. Hitchcock, 229 U.S. 162, 171, 33 S.Ct. 639, 57 L.Ed. 1135; Reynolds v. United States, 292 U.S. 443, 446, 54 S. Ct. 800, 78 L.Ed. 1353.