RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0076p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

CENTURY ALUMINUM COMPANY; CENTURY KENTUCKY, INC.; CENTURY ALUMINUM OF KENTUCKY GENERAL PARTNERSHIP; CENTURY ALUMINUM SEBREE, LLC,

　　　　　　　　　　*Plaintiffs-Appellants*,

　　　*v.*

CERTAIN UNDERWRITERS AT LLOYD'S, LONDON, subscribing to Policy Number B1353DC1703553000,

　　　　　　　　　　*Defendants-Appellees*.

> No. 23-5543

─────────────────

Appeal from the United States District Court for the Western District of Kentucky at Owensboro.
No. 4:18-cv-00118—H. Brent Brennenstuhl, Magistrate Judge.

Argued:  March 21, 2024

Decided and Filed:  April 4, 2024

Before:  SUTTON, Chief Judge; STRANCH and DAVIS, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Martin H. Myers, COVINGTON & BURLING LLP, San Francisco, California, for Appellants.  Jeremy T. Grabill, PHELPS DUNBAR LLP, New Orleans, Louisiana, for Appellees.  **ON BRIEF:**  Martin H. Myers, Yurij D. Melnyk, COVINGTON & BURLING LLP, San Francisco, California, Palmer G. Vance II, STOLL KEENON OGDEN PLLC, Lexington, Kentucky, for Appellants.  Jeremy T. Grabill, Kyle S. Moran, PHELPS DUNBAR LLP, New Orleans, Louisiana, Bobby R. Miller, Jr., Ryan A. Hahn, MILLER HAHN, PLLC, Paducah, Kentucky, for Appellees.

_____

**OPINION**

_____

SUTTON, Chief Judge.  Century Aluminum relies on river barges to obtain alumina ore and other materials that it smelts into aluminum.  When the Army Corps of Engineers closed key locks on the Ohio River in 2017 due to low water levels and mechanical breakdowns, Century scrambled to secure other transportation.  Century filed a claim with the underwriters of its maritime cargo insurance policy, referred to collectively as Lloyd's of London, for these unanticipated shipping expenses.  Lloyd's paid the company $1 million under the policy's Extra Expense Clause but denied coverage for the rest of the claim.  The district court granted summary judgment to Lloyd's.  We affirm.

I.

Inland waterways play a vital yet sometimes overlooked role in the American economy. *See New Albany Main St. Props. v. Watco Cos., LLC*, 75 F.4th 615, 619–20 (6th Cir. 2023). About seven percent of all freight tonnage moves by water, with half of that amount traveling over rivers and other inland waterways.  Bureau of Transp. Stats. & U.S. Census Bureau, *2017 Commodity Flow Survey* 29 (2020), https://www.census.gov/content/dam/Census /library/publications/2017/econ/ec17tcf-us.pdf.  Most of that cargo sits on massive barges, each of which hauls as much dry cargo as sixteen railway cars or seventy trucks.  Thanks to a series of locks, dams, canals, and other projects overseen by the Army Corps of Engineers, these barges ply the Mississippi, Ohio, and other rivers, opening commerce from the Gulf of Mexico to the Great Lakes.

Century Aluminum depends on our inland waterways, partly because some of its plants sit next to the Ohio River and its tributaries and partly because Century's operations depend on a continuous flow of minerals.  The company converts alumina ore into aluminum metal at its smelters in Hawesville and Sebree, Kentucky.  Century must continuously feed alumina to its smelters to maintain the chemical reaction or else the molten metal will freeze in its pots.  If the pot-line shuts down, it could cost Century as much as $20 million to restart.

To avoid this predicament, Century schedules the steady delivery of imported alumina to maintain a stockpile equivalent to about three weeks of production. Ocean freighters bearing alumina from Brazil, Jamaica, and other countries enter the United States at New Orleans, where Century's agents vacuum it into barges traveling up the Mississippi. The Mississippi meets the Ohio River in Paducah, Kentucky, after which the barges proceed eastward through the Corps's system of locks and canals. It takes 15 to 25 days for the barges to complete their voyage from New Orleans to Century's plants.

In early September 2017, Century expected eleven barges laden with alumina and other supplies to pass through Lock and Dam Numbers 52 and 53 outside Paducah. The Army Corps of Engineers, however, closed the locks to address mechanical breakdowns and low water levels. Century responded by diverting the barges back to a Mississippi River port, where they transferred the alumina to trucks. Century also ordered railcars to ship the alumina to Kentucky, but they failed to arrive before the Corps reopened the locks. By that point, Century had unloaded ten of the eleven barges' cargo onto the trucks, and the remaining barge completed its journey by river. Two months later, the Army Corps of Engineers again closed the locks. To protect itself from more delays, Century hired 83 railcars to ship alumina from New Orleans to Kentucky.

The arrangements worked. While Century's alumina inventories fell below the desired imperative of three weeks of production, it avoided a pot-line shutdown at its Kentucky facilities. These measures came with a cost, however. Century lost some production when it purchased lower-grade alumina as a hedge. And the alternative modes of transportation cost more than shipment by barge. Century estimated that, by the end of 2017, it had incurred over $5 million in excess costs.

Century sought to recover the costs under its marine cargo insurance policy, which Lloyd's of London underwrote. Lloyd's agreed that the policy's Extra Expense Clause covered up to $1 million of Century's extra transportation expenses, but it claimed that the policy otherwise excluded losses due to delay. After paying its deductible, Century accepted $975,000 for its extra transportation costs and continued to seek coverage for the other costs.

Unable to reach a resolution over these other transportation expenses, Century sued Lloyd's. Century sought a declaration that its denied claims came within the insurance policy and requested damages due to Lloyd's alleged breach of the contract, its failure to honor the covenant of good faith, and its violation of other causes of action under Kentucky insurance law. Lloyd's asked for summary judgment on the grounds that the policy did not cover the claims. The district court ruled for Lloyd's.

II.

The policy says that the "applicable state law" applies to disputes over its meaning, and the parties agree that the relevant law is Kentucky's. R.100-2 at 29. Kentucky respects the language of insurance contracts, reads their provisions in context, and enforces them as written. *Foreman v. Auto Club Prop.-Cas. Ins. Co.*, 617 S.W. 3d 345, 349–50 (Ky. 2021).

The marine cargo insurance policy extends coverage to Century's goods, merchandise, and cargo, "including but not limited to Coke, Alumina, Alumina products and related materials." R.100-2 at 3. It also covers "Consequential loss" such as Century's lost profits. *Id.* At issue in this appeal is whether the policy, namely the "Conditions" on obtaining coverage, requires Lloyd's to provide Century with more than the $1 million of the Extra Expense Clause. *Id.* at 4. Out of the forty-odd pages of this policy, the parties have identified four potentially material clauses. We consider each in turn.

*All Risks Clause.* Start with the policy's initial "Condition"—that it provides coverage "[a]gainst all risks of physical loss of or damage to the subject-matter insured from any external cause." *Id.* Such clauses commonly appear in maritime insurance to clarify that the policyholder will receive compensation for fortuitous losses, meaning those that do not result from inherent defects, ordinary wear and tear, or intentional misconduct by the insured. *See Goodman v. Fireman's Fund Ins. Co.*, 600 F.2d 1040, 1042 (4th Cir. 1979).

Although the policy does not define "physical loss," Kentucky law says that the phrase means "that a property owner has been tangibly deprived of the property," such as by theft, "or that the property has been tangibly destroyed," such as by fire. *Estes v. Cincinnati Ins. Co.*, 23 F.4th 695, 700 (6th Cir. 2022); *see Varanese Fusion, LLC v. Erie Ins. Exch., Member Erie*

*Ins. Grp.*, No. 2022-CA-0822, 2023 WL 4982587, at *2 (Ky. Ct. App. Aug. 4, 2023) (accepting this definition from federal cases as state law). "Loss" standing by itself may be ambiguous. But a "physical loss" conveys that some property has been "tangibly destroyed, whether in part or in full." *Santo's Italian Café LLC v. Acuity Ins. Co.*, 15 F.4th 398, 401 (6th Cir. 2021). The pairing of "physical loss" with "damage" reinforces the emphasis on destruction of the goods. R.100-2 at 4. Hence, the policy excludes "loss or damage" to aluminum coils that result from "rust, oxidisation, bending or twisting"—material changes to the nature of the goods themselves. *Id.*

Kentucky also understands physical loss to exclude purely economic losses. If someone suffers only "'detrimental economic impact' without a tangible destruction or deprivation of property," the Commonwealth would not say that a "physical" loss has occurred. *Estes*, 23 F.4th at 700 (quoting 10A Steve Plitt, et al., *Couch on Insurance* § 148:46 (3d ed.)). Profits or income streams recorded in ledger books and electronic bank accounts lack the physical existence that could suffer loss or damage. *Veneman v. Travelers Cas. Ins. Co. of Am.*, 2022-CA-0021, 2023 WL 3261555, at *6 (Ky. Ct. App. May 5, 2023). Reinforcing this understanding, the insurance policy distinguishes Century's financial harms from physical loss. The Extra Expense Clause covers up to $1 million for "each and every loss" due to delays in obtaining physical possession of the alumina, as distinct from physical loss or damage. R.100-2 at 10, 14. And the Interests Clause guards against "Consequential loss," which a subsequent clause defines as certain lost profits or increased debts resulting from "loss of or damage to or delay in the delivery of the property." *Id.* at 3, 14.

Under the All Risks provision, Century's alumina did not suffer any physical loss or damage. The temporary delay never threatened to deprive Century of its ownership or control of the alumina. The company, on the contrary, retained sufficient control over the alumina to deliver it by other transportation means. Nor has Century alleged any damage. All of the alumina arrived at Century's facilities no worse for the wear. Century, it is true, suffered a loss of profitability. But the insurance policy addressed this intangible claim under the Extra Expense Clause, not the All Risks provision. A "Trade Disruption policy," for what it is worth, could have provided additional "coverage for any event which disrupts service and causes a

production loss," but Century declined to purchase that insurance from a different underwriter. R.100-17 at 1.

Century counters that the shipment delays created a risk of physical loss to the alumina because the lock closures "tangibly deprived [Century] of the ability to use its insured property in its ordinary manner." Appellant's Br. 20. But that argument sidesteps the reality that the modifier "physical" refers to the transformative or tangible nature of the loss to the insured interest, not the difficulties to the policyholder. *See Wild Eggs Holdings, Inc. v. State Auto Prop. & Cas. Ins. Co.*, 48 F.4th 645, 653 (6th Cir. 2022); *Santo's*, 15 F.4th at 401, 403. All of this explains why an All Risks policy treats the theft of a vessel's motor as physical loss or damage. The problem is that the theft makes the vessel useless; it is not that the owner must find another way to go boating that day. *See* 9A *Couch on Insurance* § 137:16; *cf. Estes*, 23 F.4th at 700. Likewise, the "mysterious disappearance" of coffee beans from storage constitutes physical loss because they are no longer present, which means the owner can no longer use or sell them for any purpose. *In re Balfour Maclaine Int'l Ltd.*, 85 F.3d 68, 77 (2d Cir. 1996). Even Century's own authorities recognize that deprivation of use constitutes loss under an All Risks policy only when the owner has lost all "possession or control of the [property] since that date," *Intermetal Mexicana, S.A. v. Ins. Co. of N. Am.*, 866 F.2d 71, 76 (3d Cir. 1989), or the property has become "unusable" because it has become physically defective, unsafe, or otherwise "uninhabitable," *Universal Image Prods., Inc. v. Fed. Ins. Co.*, 475 F. App'x 569, 574–75 (6th Cir. 2012). That did not happen here.

*Risks Covered Clause.* In addition to the All Risks Clause, the policy contains a second statement of general coverage in a section entitled "Risks Covered." R.100-2 at 25; *see also Opera Boats, Inc. v. La Reunion Francaise*, 893 F.2d 103, 104 (5th Cir. 1990) (observing that this clause is also known as the "named perils" provision). The clause has been a staple of maritime insurance contracts for centuries. *See McCall v. Marine Ins. Co.*, 12 U.S. 59, 66 (1814). Its language, as the reader will soon see, reflects that heritage, prompting us to italicize the sections that bear on today's discussion for ease of reference:

> Touching the adventures and perils which the Underwriters are contented to bear and do take upon themselves in this voyage, they are of the seas and inland

> waters, men-of-war, fire, enemies, pirates, rovers, thieves, jettison, letters of mart and countermart, surprisals, takings at sea, *arrests, restraints and detainments of all Kings, Princes and People of what nation, condition or quality soever*, barratry of master and mariners, *and of all other like perils, losses or misfortunes that have or shall have come to the hurt, detriment or damage of the said goods and merchandises and ship, or any part thereof.*

R.100-2 at 25. In the aftermath of British blockades of Atlantic ports during the War of 1812, the Supreme Court explained that arrests and detainment occur when a government authority takes possession of the vessel or its cargo. *Olivera v. Union Ins. Co.*, 16 U.S. 183, 189 (1818); *see also* 9A *Couch on Insurance* § 137:53 (defining an arrest as a "temporary detention"). It distinguished those contingencies from a restraint, which arises from "the forcible confinement of a vessel in port, and the forcible prevention of her proceeding on her voyage," such as when a blockade prevents a ship from leaving port. *Olivera*, 16 U.S. at 194; *see also Calmar S.S. Corp. v. Scott*, 345 U.S. 427, 441, 442 n.11 (1953) (describing "Allied restraints" and "restraint of princes" under analogous conditions during World War II). The Court also considered the situation of a vessel that changes course after learning that its intended destination faces a blockade. It explained that the vessel has not suffered a restraint because the government has not "directly" forced the vessel to halt its journey. *Olivera*, 16 U.S. at 192–93; *see Smith v. Universal Ins. Co.*, 19 U.S. 176, 186–87 (1821).

The Risks Covered Clause does not cover Century's situation. The government never took control of the barges or impounded the alumina, ruling out arrest and detainment. *Olivera*, 16 U.S. at 189. Nor did Century suffer a restraint. Once it learned of the Corps's closures, it diverted its barges down the Ohio River for unloading on the Mississippi River. The barges never found themselves trapped within the locks, unable to escape. *Cf. id.* at 193–94.

Century also did not suffer any "other like perils, losses or misfortunes" under the general clause found at the end of the Risks Covered provision. R.100-2 at 25. Not only does that clause go on to require "the hurt, detriment or damage of the said goods and merchandises and ship," *id.*, but its limitation to perils, like those already listed, limits its scope to risks akin to piracy, fire, and similarly destructive harms, 9A *Couch on Insurance* § 137.9. The cargo and its barges did not face any such threats.

Century responds that restraint occurs whenever the "government assumes general control over the movements of a vessel." Reply Br. 13 (quoting *Reinold v. United States*, 167 F.2d 556, 558 (2d Cir. 1948)). That may be so. But there is an ocean of difference between the Army Corps of Engineers ordering Century to sail to a different port and Century's voluntary decision to redirect its cargo down the Ohio River to the Mississippi River. *Compare Standard Oil Co. of N.J. v. United States*, 267 U.S. 76, 77–78 (1925) (holding this clause satisfied when an armed boarding party ordered ship to change course during World War I), *with Reinold*, 167 F.2d at 558 (holding that no restraint occurred when armed naval guards did not restrict the master's control of the vessel during World War II), *and Crist v. U.S. War Shipping Admin.*, 163 F.2d 145, 150 (3d Cir. 1947) (explaining that the "practical necessity" of joining a wartime convoy did not constitute restraint in the absence of government compulsion).

*Shipping Expenses Clause.* Century turns to the policy's Shipping Expenses Clause. This provision covers "reasonable direct charges incidental to shipping" when "the subject matter insured is not delivered to the destination contemplated due to circumstances beyond the control of the Insured." R.100-2 at 25–26. But it covers the risk of a failed delivery, not an untimely delivery. *Cf. Glennborough Homeowners Ass'n. v. U.S. Postal Serv.*, 21 F.4th 410, 412 (6th Cir. 2021) (contrasting mail that "was not delivered" with the successful delivery of mail). Century does not dispute that its alumina eventually arrived at its facilities.

Even so, Century maintains, the Clause uses the phrase "not delivered" as opposed to "never delivered," which suggests that it covers expenses associated with delays in reaching the intended destination. Appellant's Br. 34–35. But plenty of English speakers, most of them indeed, mean "never delivered" when they say "not delivered." *See, e.g.*, *Jones v. Flowers*, 547 U.S. 220, 237 (2006) (discussing the government's obligations when it "learns that notice was not delivered" because the notice was returned to the sender); *Nat'l City Bank, Nw. v. Columbia Mut. Life Ins. Co.*, 282 F.3d 407, 408 (6th Cir. 2002) (describing a contract which required repayment of unearned commissions when a policy was "not taken, not delivered, or otherwise lapsed"). Even when construing insurance contracts, we accept ordinary uses of English. Just as we would not expect to see irony in an insurance contract, we would not expect to see a distinction between "never" and "not." The Extra Expense Clause shows that Century and

Lloyd's fully understood how to account for additional sums spent on "attempting to prosecute an intended voyage" in the face of "delay[]," "whether such attempt may ultimately prove successful or otherwise." R.100-2 at 10.

*Sue and Labour Clause.* Last of all comes the Sue and Labour Clause. This provision imposes an obligation on the insured to exercise a duty of care to prevent losses to the insurer and, if need be, to minimize them. *See Ope Shipping v. Allstate Ins. Co.*, 687 F.2d 639, 643 (2d Cir. 1982). The clause promises that, "in case of actual or imminent, loss, damage, cost or expense," Lloyd's will reimburse Century for its expenditures in protecting the "interests insured" and in "reducing . . . any potential loss or liability under this Contract." R.100-2 at 26. This provision, as Century reads it, requires Lloyd's to pay for the additional shipping expenses that prevented the physical loss of its aluminum and reduced the possibility of an imminent pot-line freeze and any consequential losses.

The Sue and Labour Clause does not assist Century. The Sue and Labor Clause promises to reimburse Century for fulfilling its duty to mitigate Lloyd's exposure under the policy, but it does not obligate Lloyd's to pay anything for reducing losses that fall outside the policy. *See Continental Food Prods., Inc. v. Ins. Co. of N. Am.*, 544 F.2d 834, 837 (5th Cir. 1977). While the interests insured under this contract include both the alumina and certain profits, the contract conditions that coverage on "risks of physical loss of or damage to the subject-matter insured." R.100-2 at 4. Had Century faced a risk of physical loss or destruction, such as if the delay resulted in the cargo rotting or the barges capsizing, the Sue and Labour Clause would have obligated Lloyd's to compensate Century for reasonable efforts to secure delivery by other means. *See St. Paul Fire & Marine Ins. Co. v. Pac. Cold Storage Co.*, 157 F. 625, 629–31 (9th Cir. 1907); *see also Homes Ins. Co. v. Ciconett*, 179 F.2d 892, 895–96 (6th Cir. 1950) (observing that a Sue and Labour Clause may operate as a separate contract requiring payment beyond the limits stated elsewhere in the insurance policy). But because Century did not face an actual or imminent risk of physical loss or destruction to its *alumina*, the Sue and Labour Clause did not require Lloyd's to compensate Century for these expenses. *Cf. GTE Corp. v. Allendale Mut. Ins. Co.*, 372 F.3d 598, 618 (3d Cir. 2004).

Century responds that the policy separately covers Century's "Interest" in safeguarding its profits from consequential losses. But the "Marine Consequential Loss Insurance" section of the contract sets the conditions under which Lloyd's will compensate Century for these losses. R.100-2 at 14. Triggering this coverage is any "risk which would be covered under the terms, clauses and conditions of this insurance" that results in "loss of or damage to or delay in the delivery of the property" and that causes Century's production to fall below a benchmark level. *Id.* Lloyd's has agreed to pay for lost profits and charges that result from an actual shortfall, as well as "additional expenditure reasonably and necessarily incurred for the sole purpose of avoiding or diminishing the reduction in production . . . in consequence of the contingency." *Id.* at 15.

Read together, the Marine Consequential Loss Insurance provision and the Sue and Labour Clause show that the policy did not cover Century's efforts to protect its profits. Century did avert a costly pot-line freeze through its efforts to rearrange its alumina deliveries in the face of delays, and it suffered "some production loss" when it purchased lower quality alumina as a hedge. R.107-2 at 37. But Century has not shown that it satisfied the condition of taking these actions in response to a "risk which would be covered" by the policy. R.100-2 at 14. The record does not contain any indications that Century faced the risk of a pot-line freeze due to physical loss or damage to its alumina. Nor does it show that the extra alumina hedge suffered any tangible degradation in quality on its way from the mine to Kentucky. Century did face the risk of shipping delays, but those delays did not result from arrest, detainment, or restraint. In the absence of those risks, the Marine Consequential Loss Insurance provision does not apply. And because the Sue and Labour Clause remains "subject always to the terms, conditions, limitations and exclusions of this Insurance," Century may not invoke it to circumvent this requirement of a covered risk. *Id.* at 26.

Before concluding, it is worth noting that the policy also incorporates by reference the "American Institute Cargo Clauses." R.100-2 at 4. The thirteenth and final clause excludes the risks of "arrest, restraint, [and] detainment" and "loss, damage or deterioration arising from delay" except where the policy affirmatively includes them. Am. Inst. Marine Underwriters, American Institute Cargo Clauses 32B-10 § 13(A), (C) (Apr. 1, 1966),

https://www.aimu.org/forms/32B-10.pdf.   These exclusions may have denied Century coverage beyond the Extra Expense Clause even had it been able to identify a covered risk.  *Cf. Blaine Richards & Co., Inc. v. Marine Indem. Ins. Co. of Am.*, 635 F.2d 1051, 1056 (2d Cir. 1980).   But because the parties focused their briefing only on the threshold question of whether Century experienced that risk, we need not determine how these standard maritime exclusions apply here.

We affirm.